Argued and submitted September 8, 1999, Griffin suspended from the practice of law for 12 months and Brandt suspended from the practice of law for 13 months September 14, 2000

In re Complaint as to the Conduct of

## William D. Brandt,
*Accused.*

In re Complaint as to the Conduct of

## Mark E. Griffin,
*Accused.*

### (OSB 95-6; SC S45122, S45123)

10 P3d 906

Peter R. Jarvis, Stoel Rives LLP, Portland, argued the cause and filed the briefs for the accused, William D. Brandt.

W. Eugene Hallman, Pendleton, argued the cause and filed the briefs for the accused, Mark E. Griffin.

Mary A. Cooper, Assistant Disciplinary Counsel, Lake Oswego, argued the cause and filed the brief for the Oregon State Bar. With her on the brief was Jeffrey Sapiro.

Before Carson, Chief Justice, and Gillette, Van Hoomissen, Kulongoski, Leeson, and Riggs Justices.*

PER CURIAM

---

* Durham, J., did not participate in the consideration or decision of this case.

Kulongoski, J., concurred in part, dissented in part, and filed an opinion in which Riggs, J., joined in part.

Riggs, J., concurred in part, dissented in part, and filed an opinion in which Kulongoski, J., joined in part.

**PER CURIAM** .

In this consolidated lawyer discipline proceeding, the Oregon State Bar (Bar) charged William D. Brandt and Mark E. Griffin (collectively, "the accused") with violating four disciplinary rules of the Code of Professional Responsibility: Disciplinary Rule (DR) 5-101(A)(1) (prohibiting accepting or continuing employment when exercise of lawyer's judgment will be or reasonably may be affected by lawyer's own interest, except with consent of client after full disclosure); DR 1-102(A)(3) (prohibiting engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation); DR 1-103(C) (requiring full and truthful responses to inquiries in disciplinary proceeding); and DR 2-108(B) (prohibiting, in connection with settlement, entering into an agreement that restricts lawyer's right to practice law). A trial panel of the Disciplinary Board found that the accused had committed all the charged violations and recommended that each lawyer be suspended from the practice of law for six months. One panel member dissented, concluding that the charges against the accused should be dismissed.

■   The accused have sought review of the trial panel's decision. ORS 9.536(1); Bar Rule of Procedure (BR) 10.1. This court reviews the record *de novo*. ORS 9.536(3) and BR 10.6. The Bar has the burden of establishing alleged misconduct by clear and convincing evidence. BR 5.2. The testimony of an accused lawyer, if this court deems it credible, can be sufficient to establish facts. *In re Gildea*, 325 Or 281, 295-96, 936 P2d 975 (1997). We hold that the accused violated DR 5-101(A)(1), DR 2-108(B), and DR 1-102(A)(3). We suspend Griffin for a period of 12 months, and we suspend Brandt for a period of 13 months.

## I. FACTS

We find the following facts by clear and convincing evidence. The accused are partners in different law firms. Brandt's firm is in Salem, and Griffin's is in Portland. For many years, Brandt successfully represented hand tool distributors against the manufacturers of those tools. When the volume and complexity of those cases grew, Brandt began to associate Griffin as co-counsel. Griffin's practice emphasizes

plaintiffs' complex business fraud litigation. In 1992, the accused agreed to represent Eric Bramel and his wife, former hand tool distributors, in resolving claims against Mac Tools. Bramel signed a retainer agreement that included a contingent fee provision of 45 percent of any recovery from settlement, trial, or appeal.

Initially, Bramel had hoped to net $1.5 million after all legal expenses. Late in December 1992, Bramel filled out a client questionnaire that Brandt had given him, and Brandt then drafted, but did not file, a complaint seeking $150,000 in compensatory damages and $4,445,000 in punitive damages from Mac Tools.

On April 1, 1993, Brandt told Bramel that Bramel's hope to net $1.5 million was not realistic, that Bramel should demand $275,000, and that he should accept a net settlement of between $130,000 and $150,000. Later that month, Brandt told Mac Tools that Bramel would settle his claims for $275,000. In mid-September 1993, Mac Tools countered with a net settlement offer of $19,700. Griffin recommended that Bramel reject that offer, and Bramel did so.

In late September, Bramel told Griffin that he needed $100,000 "in his pocket," because his financial situation was desperate and he might be forced to declare bankruptcy. Griffin responded that he would have more information about a settlement within 30 days.

By fall 1993, the accused had 49 clients, including Bramel, who had claims against Mac Tools. In October 1993, Brandt met in Denver with three other lawyers—Wagner, Miller, and Napper—who represented clients with claims against Mac Tools and its parent company, The Stanley Works (Stanley). Among them, the lawyers represented approximately 120 clients. The lawyers discussed the possibility of "global settlement negotiations" with Mac Tools and Stanley.

On October 18, 1993, Bramel told Griffin that he would settle his claim for $175,000. Later that month, Griffin told Bramel that Mac Tools and Stanley had agreed to try to settle the cases on a "global" basis and that Griffin and

Brandt would continue "to press [Bramel's] individual settlement demand." Griffin also told Bramel that Mac Tools and Stanley had agreed to toll the statute of limitations until after the global settlement negotiations had terminated.

Mac Tools, Stanley, and the plaintiffs'[1] lawyers agreed to meet in Chicago with a private mediator on November 5, 1993, to discuss settlement. On November 2, 1993, Bramel had reduced his demand to $165,000, an amount he told the accused was "the bare minimum acceptable."

On November 3, 1993, apparently in response to conversations that Wagner, Napper, Miller, and Brandt had had during their October meeting in Chicago, Wagner sent Griffin a copy of an article from an *ABA Journal* and an ABA ethics opinion about restricting the practice of law in connection with settlements. The article criticized Model Rules of Professional Conduct, Rule 5.6(b), and Model Code of Professional Responsibility, DR 2-108(B), both of which prohibit a lawyer from participating in offering or making an agreement that restricts the lawyer's right to practice law when settling a case. The ethics opinion expressed the view that "a lawyer may not offer, nor may opposing counsel accept, a settlement agreement which would obligate the latter to limit the representation of future claimants." ABA Comm. on Professional Ethics and Grievances, Formal Op. 371 (1993).

Griffin attended the meeting in Chicago on November 5, 1993. Four days later, on November 9, he told Brandt and Weiss, another plaintiffs' lawyer, that Weddle, a Stanley vice-president, had expressed concern during the November 5 meeting that there be "no future litigation" against his company and had stated that the only way that he could be assured of that would be to retain the plaintiffs' lawyers to represent Mac Tools and Stanley in the future.[2] According to Griffin, Weddle had "insisted that there be a linkage between settlement of present cases and a future agreement that we

---

[1] The parties use the term "plaintiffs" even though not all the clients had filed complaints against Mac Tools or Stanley. We follow that practice for convenience in this opinion.

[2] The parties refer to Mac Tools, Mac Tools, Inc., The Stanley Works, and Stanley interchangeably to refer to The Stanley Works, which is the parent company of Mac Tools, Inc. Henceforth, we use the term "Stanley."

[the plaintiffs' lawyers] be retained by Mac [Tools] and Stanley." The plaintiffs' lawyers who were present at the meeting had responded that they would not discuss future employment and walked out of the room. Communicating through the mediator, the plaintiffs' lawyers subsequently offered to settle all the cases for approximately $18,060,000. Stanley countered with an offer of $9.5 million, which the plaintiffs rejected. Griffin has no "independent recollection" whether he told Bramel about Weddle's offer to hire the plaintiffs' lawyers. Brandt told some, but not all, of his clients about Stanley's retainer offer.

On December 20, 1993, both the accused attended another settlement meeting in Chicago. The lawyers present at that meeting agreed to settle all the claims for $13.32 million, subject to the approval of individual plaintiffs.[3] The proposed settlement made no mention of the plaintiffs' lawyers being retained by Stanley in the future. After December 20, the accused began conferring with their clients to determine whether the clients would agree to the settlement amounts contained in the December 20 proposal.[4] According to Brandt, Griffin had more responsibility for contacting clients than Brandt did. Brandt did talk informally with some of the clients, but neither he nor Griffin sent out letters about the December 20 proposed settlement, and Brandt kept no notes about what he said to any of the clients. Brandt believed that, by January 4, 1994, he and Griffin "had basically communicated with most of them * * * or I think all of them * * * that we had reached the numbers [i.e., amount of the settlement]." However, Brandt himself did not have "any recollection of any discussion with the clients," and he could not recall having any telephone conversations with Bramel between November 1, 1993, and January 11, 1994. On January 6, 1994, Brandt disagreed with Wagner that the agreement of

---

[3] For the accused's clients, the settlement reflected approximately 80 percent of their latest demand. As noted, on November 2, 1993, Bramel had reduced his demand to $165,000. Under the terms of the proposed settlement, Bramel would receive $133,045.31, and Mac Tools would forgive the sum of $6,300 that it claimed Bramel owed it. After deducting the accused's attorney fees of approximately $29,900 each, Bramel would net approximately $73,000 from the settlement.

[4] Justice Riggs apparently believes that the settlement became final on December 20 and that neither the accused nor any of the other plaintiffs' lawyers had to obtain their clients' consent to the amount of the settlement. See 331 Or at 172.

December 20, 1993, was final regarding the amount of the settlement, because "we had some clients to contact. But we had expressed to [Wagner] we were confident those clients would accept the Mac final offer."

Griffin testified that he did not believe that Bramel had conversations with anyone else except Griffin about the settlement. Griffin also testified that, although he "may have mentioned" the December 20 settlement to Bramel before January 13, he specifically remembers talking to Bramel on January 13. Griffin testified that Bramel agreed to the amount of the settlement on that date and that Griffin wrote "1-13-94, okay[ ]" next to $133,045.31 on the ledger that he had prepared reflecting the amount that each of his and Brandt's clients would receive under the terms of the proposed settlement.

Bramel, by contrast, testified that he did not learn of the amount of the settlement until he received a letter from the accused dated January 17, 1994. He also testified that the letter concerned him because the "settlement amount was lower than we had discussed" with the accused previously.[5]

Whether Bramel had agreed orally by January 11, 1994, to accept $133,045.31 to settle his claims against Mac Tools is significant regarding the conflict-of-interest issues that are at the heart of this case. Based on the record before us, we find that Bramel did not agree to the amount of the proposed settlement until after January 11, 1994.[6]

---

[5] We agree with Justice Kulongoski that Bramel knew of the amount of the proposed settlement before January 17, because Bramel contacted another lawyer, Kuhling, on January 18, 1994, to discuss the terms of the settlement agreement with him.

[6] Justice Kulongoski surmises that Bramel must have agreed orally to accept $133,045.31 in settlement of his claims on or before January 11, 1994. That premise is central to Justice Kulongoski's conclusion that the accused did not violate DR 5-101(A)(1) or DR 1-102(A)(3), because the retainer agreement was a matter separate from the settlement of Bramel's claims. We do not dispute that Griffin may have received oral consent to the amount of the settlement from some *other* clients before January 11, but that is not the issue in this proceeding. The issue here is whether *Bramel* agreed to the amount of the settlement before the accused entered into an agreement with Mac Tools that created a conflict of interest. The record does not support Justice Kulongoski's belief that Bramel had consented orally to the settlement by January 11.

On January 4, 1994, Richards, a lawyer for Stanley, sent Brandt drafts of three forms of settlement reflecting the three kinds of claims that the parties were negotiating: one "where there is a filed action against Mac Tools; one where there is a filed action against both Mac and [Stanley]; and one where action is unfiled." Those drafts made no mention of Stanley retaining plaintiffs' counsel.

On January 5, 1994, Richards talked to Wagner, who was acting as the spokesperson for the plaintiffs' lawyers, and she again raised the issue of Stanley retaining the plaintiffs' lawyers as part of the settlement. On January 6, Wagner sent a letter to Richards expressing "distress" over Richards's proposal for a retainer provision in the settlement agreement. Wagner reminded Richards of earlier conversations they had had about "ethical prohibitions" and the parties' agreement not to make "the negotiation and settlement of existing claims and cases contingent in any way upon any agreement regarding representation of future claimants." Wagner reiterated that "[t]he Chicago settlement [of December 20] was not contingent upon any agreement to represent or not represent Stanley or Mac [Tools], post settlement." Finally, Wagner also told Richards that the drafts of the settlement agreement that Richards had sent on January 4 were acceptable to the plaintiffs' lawyers. Wagner sent copies of his letter to the other plaintiffs' lawyers, including the accused, who agreed with Wagner about "the issue of retention."

On January 6, 1994, after she had received Wagner's letter, Richards sent all the plaintiffs' lawyers a new paragraph that she proposed be inserted into the various settlement agreements. It provided:

> "#. *Retention of Counsel.* Distributor understands that, upon execution of this Agreement resolving all matters and disputes between the Distributor and Mac Tools, counsel for the Distributor will be retained by Mac Tools at counsel's normal hourly rates to advise Mac Tools, and the Distributor approves this retention. By his signature approving this Agreement, counsel for Distributor agrees to, acknowledges, approves and accepts this retention."

Richards enclosed a copy of *Kaplan v. Emerson Radio Corp.*, No. 90-CV-3166, 1991 WL 41846 (E.D.N.Y Mar. 14, 1991), which, in her view, indicated that it was ethical and proper to have a retainer provision as part of a settlement agreement.

On January 7, 1994, Wagner, on behalf of the plaintiffs' lawyers, wrote to Richards:

"The case you have provided to us does not discuss whether it is ethical for a defendant to make the retention of a plaintiff's attorney a component of the settlement of a claim between the parties. * * *

"Our firm has reached an agreement with Mac [Tools]/ Stanley to settle all the claims we presently have. Our agreement was not contingent upon our firm agreeing to represent Mac [Tools]/Stanley in the future. We consider your proposal to include the 'Retention of Counsel' language in the settlement agreements to be inconsistent with the settlement agreement. *Again, we will not agree to be retained by Mac [Tools]/Stanley nor will we even discuss such a topic, nor the topic of possible procedures relating to our representation of future clients until such time as the releases are signed and the money distributed.*"

(Emphasis added.)

In Griffin's view, the retainer provision that Richards proposed on January 7 meant that the parties "didn't have a meeting of the minds and therefore we [didn't] have a settlement agreement." On January 10, Griffin wrote a memo to Brandt stating that " 'No meeting of the minds' comes through loud and clear" and that "[i]t is interesting that [Richards] admits that our future retention is a condition of settlement." The plaintiffs' lawyers discussed trying to enforce the settlement agreement without the retainer provision, but they were concerned that doing so would delay settlement and that rejecting the retainer provision would unravel the proposed agreement that the lawyers had reached on December 20. The lawyers also were concerned about the impact of a summary judgment ruling that Stanley recently had obtained in a similar case.

On January 10, 1994, Griffin wrote to Brandt and two other plaintiffs' lawyers that he had a pretrial statement due on January 12 with a court in California regarding five of

the claims in the global settlement negotiations that were scheduled for trial. The statement that Griffin planned to file contained the following paragraph:

> "After the settlement agreement was reached, counsel for Mac Tools and [Stanley] has attempted to enforce an additional condition of settlement, *one which is both unethical and illegal*. That provision is as follows: Mac Tools and [Stanley] have insisted that counsel for the plaintiffs in each of these groups agree to be retained by Mac Tools and [Stanley]. *This condition, of course, is both unacceptable and unenforceable. It is now the sole impediment to payment of the settlement proceeds.*"

(Emphasis added.) Griffin told the other plaintiffs' lawyers that, in Griffin's view,

> "I think it is time to stop playing games with Ms. Richards and her clients. Perhaps if we sent this [statement to the court] to Ms. Richards and told her our dilemma she might get the hint that it is time to take the money out of their pockets and put it in ours."

Griffin also stated that he could draft a complaint for breach of the settlement agreement in a very short time.

According to Brandt, Richards' proposal to insert a retainer provision into the proposed settlement was "a complete curve" that precipitated an emergency meeting in Chicago on January 11, 1994. Brandt attended that meeting; Griffin remained in Portland. At the beginning of the meeting, Weddle congratulated the plaintiffs' lawyers on the agreement to settle the claims and then stated that Stanley wanted to retain them. Richards explained that she had done a good deal of research and was convinced that there was a way to include the retainer provision in the settlement agreement without violating any ethical prohibitions. After the parties went to their respective "break out" rooms, the mediator proposed to the plaintiffs' lawyers that they sign individual retainer agreements with Stanley, and give them to the mediator to hold "in escrow" until all the clients had executed settlement agreements, all settlement amounts had been paid, and all pending actions had been dismissed. According to the mediator, if any of the clients did not consent to the

retainer provision, none of the retainer agreements would go into effect.

From Chicago, Brandt called Griffin in Portland to explain the retainer and escrow proposals, and Griffin told him that he wanted to talk to Riemer, the Bar's general counsel. Griffin took only sketchy notes of his conversation with Riemer. Riemer, who receives as many as ten telephone calls a day from lawyers seeking ethical advice, took no notes. According to Griffin, he explained to Riemer that Stanley was attempting to impose another condition of settlement, namely, that the plaintiffs' lawyers sign retainer agreements as part of the settlement, and that Griffin was worried about the "taking yourself out of the market problem." Griffin also wanted to know whether, "if we got a retainer from Mac Tools, would we have to share this retainer with our client." Griffin's final concern was how much information he and Brandt had to share with their clients about their relationship with Stanley. Griffin believes that he told Riemer that the retainer agreement documents were to be signed that day, before any of the lawyers had had an opportunity to talk to their clients and obtain their consent. Riemer advised Griffin that the proposed course of action was "hypothetically possible." According to Griffin, Riemer told him that Griffin and Brandt would have to give full disclosure under DR 5-101(A)(1). That rule defines full disclosure as an explanation sufficient to apprise a client of the potentially adverse impact to the client of a matter to which a client is being asked to consent.

Although Riemer does not remember the details of his conversation with Griffin, he believed that the retainer proposal did not raise a problem under DR 2-108, because he did not understand that the retainer agreement was a condition of settling the plaintiffs' claims against Stanley. Riemer is certain that, if Griffin had mentioned an escrow arrangement as a means of avoiding violating DR 2-108, Riemer would have remembered it, because that approach would have been "very unique."

Later on January 11, 1994, Brandt, along with the other plaintiffs' lawyers who were at the Chicago meeting, signed a document entitled "Escrow Instructions—Mac Tool

Litigation." That document stated that the parties appointed the mediator to serve as the escrow agent and that he was to hold "all conformed copies of the settlement agreement and the retention agreements" until such time as Weddle, on behalf of Stanley, and Napper, on behalf of all the plaintiffs, instructed him to distribute the documents. The document that Brandt signed also stated that, if the mediator did not receive written instructions to distribute the documents "from both Parties by 5:00 p.m. EST on January 26, 1994, he shall destroy the documents." Brandt also signed a document entitled "Settlement Agreement." It provided, in part:

> "3. The parties acknowledge that Counsel did not solicit, request or otherwise seek to be retained by Mac Tools as part of entering into this Settlement Agreement or the Settlement Agreements on behalf of each of the clients set forth on Attachment A. The parties further acknowledge that retention by Mac Tools is not a term of the Settlement Agreement."

Also on January 11, 1994, Griffin signed documents agreeing to act as counsel and provide legal services to Stanley. Those documents provided that he would be paid $10,000 and $175 per hour during 1994. At the request of the plaintiffs' lawyers, the retainer agreement that Griffin signed included a provision indemnifying him from any claim by current clients that might arise from the retainer agreement.[7] The plaintiffs' lawyers placed all the retainer agreements in escrow with the mediator.

On January 13, 1994, Griffin called Bramel to discuss the settlement and advised him about Stanley's retainer proposal. Four days later, on January 17, the accused sent a letter to Bramel that stated, in part:

> "*After we obtained Mac [Tools]/Stanley's agreement to resolve our cases* for a sum certain, Mac [Tools]/Stanley made a separate offer to hire [Brandt's and Griffin's law firms] to work for Mac [Tools]/Stanley in the future. Mac [Tools]/Stanley's retaining of [Brandt's and Griffin's law

---

[7] On January 19 and 20, 1994, Brandt signed similar retainer agreements, providing that he would be paid $5,000 and $125 per hour for services in 1994. The retainer agreements did not contain indemnification clauses. On January 24, 1994, he signed a retainer agreement that contained an indemnification clause.

firms] was not solicited by us in any way. However, after consideration, [Brandt's and Griffin's law firms] agreed to provide certain legal advice and counsel on improving their distribution recruitment practices. Once we are retained by Mac [Tools], we will be unable to pursue claims like yours against Mac [Tools]/Stanley in the future. We are disclosing this information to you because we feel that we have an obligation to do so[.]

*"Because this situation may appear to create a conflict of interest,* we recommend that you seek independent legal advice to determine if consent should be given."

(Emphasis added.) The accused enclosed a copy of the proposed settlement agreement with their letter. The retainer provision that Richards had proposed on January 6, 1994, appeared as paragraph number 7 of the settlement agreement. Although the escrow agreement that Brandt had signed contained a January 26 deadline, the letter to Bramel did not state that Bramel needed to sign the agreement within a specified period of time.

 Bramel talked to Griffin on January 22, 1994, about the indemnification, confidentiality, and noncooperation provisions in the settlement agreement. Either on that date, or within a few days thereafter, Griffin told Bramel that, if Bramel rejected the settlement, Griffin would not represent him at trial. On January 24, Bramel consulted Kuhling, a Spokane, Washington, lawyer, about the proposed settlement. After that meeting, Bramel told Griffin that he was "considering the settlement proposal" and reminded Griffin that Bramel desired that all information he had shared with Griffin and Brandt "remain confidential."

 On January 26, 1994, Griffin told Richards that four of his clients, including Bramel, had not yet signed the settlement agreement, but that Richards should receive signed copies of the agreement from those clients by the next morning. The next morning, Bramel told Kuhling that he had received numerous messages on his answering machine from Griffin "stressing the urgency of settlement before 'Mac' changes their mind" and suggesting that Bramel send the documents "back East" by facsimile. That afternoon, Kuhling told Griffin that Bramel was unhappy with the settlement

and that Kuhling believed that a conflict of interest existed. Kuhling also told Griffin that Bramel would accept $133,045.31 to settle his claims if the accused would waive their attorney fees. Griffin responded that he would reduce his fee by $5,000 if Bramel accepted his offer to do so before 11:00 a.m. on January 28. Griffin also told Kuhling that Richards had told Griffin that, if she did not have an executed copy of the agreement by noon on January 28, "she will consider the offer to have been rejected."

In a letter dated January 28, 1994, Kuhling told Bramel about his conversation with Griffin. Kuhling's letter stated, in part:

"Mr. Griffin further advises that you have only until noon today to accept the settlement. He advises that after noon today, Mac will deem the settlement repudiated. He advises he will not continue to represent you and that you'll be on your own with a speculative lawsuit against Mac.

"* * * * *

"I want * * * you to understand that I can offer no opinion about the fairness of the $133,000.00 settlement amount. I do not possess the extensive knowledge of the workings of the Mac Tool Company and their distributorship program that is possessed by you and your lawyer, Mark Griffin. Nor do I possess the knowledge of all the law affecting your case. To gain the requisite knowledge of the applicable facts and law would require extensive research. It is part of the problem that Mr. Griffin has placed you under time pressure to make this decision without adequate time for independent counsel to review the matter. You will have to rely on your own judgment as to the adequacy of the settlement amount."

However, because Bramel's financial situation had become "desperate," Kuhling suggested that Bramel's "best course of action may be to accept the settlement which, after your [attorneys'] fee, will net you approximately $73,000" and, thereafter, "consider suing your counsel for refund of the fee they extracted."

Bramel signed the settlement agreement, and Kuhling sent it to Richards within minutes of the noon deadline. By that time, all the other plaintiffs also had agreed to

the settlement, and the retainer agreements were released from escrow. On January 31, 1994, Brandt sent Bramel a check for $73,174.92, the net amount of Bramel's settlement after deduction of attorney fees.[8] Both the accused performed legal services for Mac Tools during 1994.

In March 1994, Bramel sent a complaint to the Bar. As Bar counsel understood the complaint, Bramel raised several issues. On April 8, 1994, the Bar's assistant disciplinary counsel, Cooper, sent Griffin a letter identifying ten disciplinary rules, including DR 2-108(B), that she believed "may be implicated" by Bramel's complaint. Cooper enclosed a copy of an article about DR 2-108(B) that had appeared in the Oregon State Bar Bulletin.

On April 21, 1994, the accused sent Cooper a lengthy letter that addressed each of the disciplinary rules that Cooper had indicated might be implicated by Bramel's complaint. The letter stated, in part:

> "Neither Bill Brandt and I, nor any other attorneys involved in the global settlement negotiations, agreed to work for Mac Tools while the case was still pending. *After the settlement was finalized,* the attorneys agreed to discuss a retainer with Mac Tools. Representation of Mac Tools did not commence until after the conclusion of the cases, i.e., until after [Bramel] signed the settlement agreement and returned it to Mac Tools."

(Emphasis added.) With respect to DR 2-108(B), the letter stated:

> "This rule was not violated. This was one issue which I addressed with George Reimer [*sic*] during our conversation of January 11, 1994. I was confident after that conversation with Mr. Reimer [*sic*], my independent research, and the input of other attorneys (including those who participated in the global settlement) that the settlement agreement was within ethical bounds.
>
> "I have reviewed the article written in the April, 1994, Bar Journal by Ms. Marilyn Cohen. None of the examples of inappropriate conduct are similar to the situations here.

---

[8] Because Bramel had not accepted Griffin's offer to reduce his attorney fee in the amount of $5,000 by 11:00 a.m. on January 28, the full 45 percent contingent fee was deducted from Bramel's share of the settlement.

The settlement agreement: (1) did not prohibit counsel from disclosing names of people who had contacted me, or whom I had represented; (2) did not prohibit counsel from referring clients who have claims against Mac Tools to other attorneys; (3) did not require counsel to turn over files, investigation, or discovery, to defendants; and (4) did not bar me or Bill Brandt, the Bramels, or other clients or prospective clients, from subpoenaing records or using experts, and did not otherwise impede prosecution of future cases. Nor does the agreement impose venue limits upon future claimants against Mac Tools. Although the agreement does contain a confidentiality agreement with respect to the terms of the settlement, such confidentiality agreements are not uncommon and are not prohibited. The fact that claimants against Mac [Tools] and Stanley agreed not to voluntarily cooperate with others in pressing claims against Mac Tools does not prohibit them from testifying in claims against Mac Tools if they are subpoenaed to do so. Such provisions also are not prohibited and are common in complex litigation cases."

The letter did not mention the documents that the accused had signed on January 11, 1994, and had placed in escrow.

The Bar subsequently referred Bramel's complaint to the Multnomah County Local Professional Responsibility Committee (LPRC), which assigned a Portland lawyer, Hankin, to investigate the matter. Hankin interviewed the accused in Griffin's Portland office in March 1995. At that time, Hankin believed that the two most important issues were Bramel's claims of excessive attorney fees and conflict of interest. During the interview, Griffin made available to Hankin his file on Bramel, including the retainer agreements and escrow instructions. Hankin did not look through the file. Instead, she relied on Griffin to produce documents from the file relevant to topics that Hankin raised during the interview. Griffin drew Hankin's attention to Griffin's notes of his conversation with Riemer, which contained the words "retainer agreement," but Hankin did not ask to see the agreement and did not ask what it meant.

Soon after that interview, Hankin asked to review Brandt's files at his Salem office, and Brandt agreed. Brandt gave Hankin his files on Bramel and Stanley, which contained the retainer agreement, and Hankin reviewed them in

Brandt's conference room. Hankin did not contact Riemer or the mediator who served as the escrow agent, although the accused urged her to do so. However, she did interview two of the lawyers for Stanley. Hankin filed a report on April 19, 1995, and, based on her report, the Bar filed formal complaints against the accused.

## II. ALLEGED VIOLATIONS

### A. *DR 2-108(B)*

The accused first assign error to the trial panel's finding that they violated DR 2-108(B), which provides:

> "In connection with the settlement of a controversy or suit, a lawyer shall not enter into an agreement that restricts the lawyer's right to practice law."

A violation of DR 2-108(B) requires the Bar to prove both that a lawyer entered into an agreement in connection with settlement and that the agreement restricted the lawyer's right to practice law. In its complaint, the Bar alleged:

> "Mac Tools' offer to retain the Accused was intended to restrict the Accused's right to bring lawsuits against Mac Tools in the future. Mac Tools conditioned settlement of the Bramels' case upon the Accused's agreement to be retained by Mac Tools.

> "The Accused knew that one of the reasons (if not the principal reason) Mac Tools offered to retain [them] was to prevent [them] from representing similarly situated plaintiffs in the future. Nevertheless, the Accused agreed to a settlement which was conditioned upon [their] agreement to restrict [their] practice in the future."[9]

The accused concede, and we agree, that they agreed to the retention of counsel provision in the settlement agreement "[i]n connection with the settlement" of the controversy between Bramel and Mac Tools.[10] However, the accused contend that DR 2-108(B) addresses only agreements that

---

[9] The Bar filed identical complaints against the accused.

[10] The trial panel concluded, and the Bar argues on review, that the agreement was a "condition" of settlement. We need not determine whether the retainer agreement was a condition of settlement to be able to conclude that the accused violated DR 2-108(B). A violation of that rule occurs if an agreement is made *in connection with* settlement; it is not necessary to establish that the agreement was a *condition* of settlement.

*directly* prohibit a lawyer from representing certain clients or types of clients.[11] The accused argue that the retainer agreement that they signed with Stanley only *indirectly* restricted their right to practice law. They contend that, if a retainer agreement merely requires the lawyer to provide valuable legal services, with its concomitant disqualification from representing adverse parties, the agreement does not restrict the lawyer's right to practice law within the meaning of DR 2-108(B). Any ethical issue associated with such agreements, they argue, is governed by different disciplinary rules, such as DR 5-105, which regulates current and former client conflicts of interest, and DR 5-101, which regulates conflicts between clients' and a lawyer's own interest.

The Bar responds that the retainer of counsel provision had the effect of preventing the accused from representing future plaintiffs against Stanley and, consequently, that the agreement violated DR 2-108(B). The Bar relies on several ethics opinions from other jurisdictions holding that both direct and indirect restrictions on the right to practice law violate analogues of DR 2-108(B).[12]

■ This court has not construed DR 2-108(B) previously. As framed by the parties, the issue is whether a retainer agreement that is entered into in connection with the settlement of a case and that indirectly limits a lawyer's right to practice law, violates DR 2-108(B). We hold that it does.

By its terms, DR 2-108(B) does not prohibit all agreements that restrict the right to practice law. Rather, the rule prohibits agreements that are made "[i]n connection with the settlement" of a case that restrict the lawyer's right to practice law. The rule does not distinguish between direct and indirect restrictions.

---

[11] An example of a "direct restriction" is,

"In exchange for the sum $25,000, I would agree not to pursue any employment claim not currently filed; nor would I render any assistance to other persons/attorneys making such claims."

*In Re Vanagas*, 8 DB Rptr 185 (1994).

[12] We have examined the opinions from other jurisdictions that both sides rely on in this dispute. Those decisions are distinguishable factually and do not aid either side or our analysis.

An ABA Formal Opinion has explained the policy reasons for DR 2-108(B):

> "First, permitting such agreements restricts the access of the public to lawyers who, by virtue of their background and experience, might be the very best available talent to represent these individuals. Second, the use of such agreements may provide clients with rewards that bear less relationship to the merits of their claims than they do to the desire of the defendant to 'buy off' plaintiffs' counsel. Third, the offering of such restrictive agreements places the plaintiff's lawyer in a situation where there is conflict between the interests of present clients and those of potential future clients."

ABA Formal Opinion 371 (April 16, 1993). We agree with that analysis. DR 2-108(B) is undermined equally by direct and indirect agreements that restrict a lawyer's right to practice law. Accepting the accused's argument that indirect restrictions on the right to practice do not violate DR 2-108(B) would put this court's imprimatur on a method of drafting those agreements that would evade the purpose of the rule. We decline to do so.

It is true, as the accused assert, that *every* retainer agreement restricts a lawyer's right to practice law.[13] It also is true that ethical issues associated with retainer agreements generally are governed by other disciplinary rules, such as DR 5-105 and DR 5-101. However, the fact that retainer agreements are governed by other disciplinary rules does not mean that the specific type of retainer agreement at issue in this proceeding, one made in connection with the settlement of a case, is not governed also by DR 2-108(B).

---

[13] The accused argue that the following quotation from a leading treatise on legal ethics regarding ABA Model Rule 5.6, which is similar to DR 2-108(B), assists their position:

"[T]he defendant could retain the plaintiff's lawyer, *after the settlement*, as consulting counsel on any claims arising out of the same transaction. By operation of the conflict of interest rules, that arrangement would preclude the lawyer from representing any new plaintiffs in such cases."

Geoffrey C. Hazard, Jr. & W. William Hodes, 2 *The Law of Lawyering* § 5.6:301 (Supp 1997) (emphasis added). The emphasized phrase in that treatise makes clear that the circumstances under which a retainer agreement is entered into is a critical factor under DR 2-108(B).

In this proceeding, no one disputes that one of the reasons that Richards insisted that the retainer of counsel provision be incorporated into the settlement agreement was to prevent the accused from representing other plaintiffs against Stanley in the future. As noted, the accused concede that they entered into the agreement to restrict their right to represent such clients in the future in connection with the settlement of a controversy between former Mac Tools distributors and Stanley. Accordingly, we find that the accused violated DR 2-108(B).

■■ Nonetheless, the accused argue, the Bar should be estopped from charging them with violating DR 2-108(B), because Griffin had consulted Riemer on January 11, 1994, before either he or Brandt had signed retainer agreements with Stanley, and they relied on Riemer's advice that putting the retainer agreements into escrow with the mediator was a way to avoid the prohibition in DR 2-108(B). Even assuming that Griffin fully and accurately informed Riemer about the retainer and escrow arrangement, and that Riemer opined that the arrangement would not violate DR 2-108(B), the accused would not, as a matter of law, be insulated from a determination that they violated DR 2-108(B). Just as favorable advice by the Bar's general counsel does not provide a defense to disciplinary violations, *In re Ainsworth*, 289 Or 479, 490, 614 P2d 1127 (1980), such advice does not estop the Bar from charging violations with respect to conduct undertaken after obtaining the advice of the Bar's general counsel.

B. *DR 5-101(A)*

The accused next assign error to the trial panel's finding that they violated DR 5-101(A), which provides, in part:

"Except with the consent of the lawyer's client after full disclosure,

"(1) a lawyer shall not accept or continue employment if the exercise of the lawyer's professional judgment on behalf of the lawyer's client will be or reasonably may be affected by the lawyer's own financial, business, property, or personal interests."

DR 10-101(B) addresses the issue of disclosure. It provides:

"(1)  'Full disclosure' means an explanation sufficient to apprise the recipient of the potential adverse impact on the recipient, of the matter to which the recipient is asked to consent.

"(2)  As used in DR 5-101 * * *, 'full disclosure' shall also include a recommendation that the recipient seek independent legal advice to determine if consent should be given and shall be contemporaneously confirmed in writing."

In its complaint, the Bar alleged that

"[b]y continuing to represent the Bramels despite the offer of employment by the opposing party and the Accused's eventual acceptance of that offer, the Accused continued employment despite the fact that the exercise of [their] professional judgment on the Bramels' behalf would or would likely be affected by [their] own financial, business, property or personal interests. The Accused's eventual disclosure to the Bramels of Mac Tools' offer was not contemporaneous and also omitted material facts concerning the nature and extent of the Accused['s] adverse interest and/or the potential adverse impact on the Bramels of the matter to which they were asked to consent."

The trial panel rejected the Bar's argument that the retainer offer that Stanley had made in November 1993 created a conflict of interest, and the Bar concedes before this court that no conflict of interest existed in November 1993. However, when the accused signed the retainer and escrow agreements on January 11, 1994, they acquired an interest that did, or reasonably might have, affected the exercise of their professional judgment on behalf of Bramel.

As noted, Bramel had told the accused in November 1993 that $165,000 was "the bare minimum acceptable" to settle his claims against Stanley. On December 20, 1993, the accused agreed to a settlement under which Bramel would receive a gross sum of $133,045.13. When the accused signed the settlement agreement, retainer agreement, and escrow agreements on January 11, 1994—which was before Bramel had agreed to the proposed settlement of December 20, 1993—their loyalty became divided, and a conflict of interest existed. DR 5-101(A) required the accused to disclose their conflict of interest to Bramel, and DR 10-101(B) required

them to give Bramel an explanation that was sufficient to apprise Bramel of the potential adverse impact of that conflict and to recommend that Bramel seek independent legal advice. DR 10-101(B) also required the accused's "full disclosure" to be confirmed contemporaneously in writing.

There is no dispute that the accused complied with the requirement that they advise Bramel to seek independent legal advice. However, the Bar contends that the disclosure of the conflict that the accused made to Bramel was insufficient to apprise him of the potential adverse impact that the retainer agreement had on him and that the written confirmation did not constitute either a full or a contemporaneous disclosure. The trial panel majority agreed.

■ We begin with the Bar's contention that the accused did not give Bramel timely written disclosure of their conflict of interest. DR 10-101(B)(2) requires the written disclosure to be made "contemporaneously" with the oral disclosure. The word "contemporaneously" means "at or near the same time." *Webster's Third New Int'l Dictionary*, 491 (unabridged ed 1993). The question is whether, by their letter of January 17, 1994, the accused "contemporaneously confirmed in writing" Griffin's oral disclosure of the conflict in his telephone call to Bramel on January 13.

After Griffin talked to Bramel on January 13, he and Brandt had to compose a letter confirming in writing what Griffin had said, and the letter had to contain both of their signatures. Brandt and Griffin's offices were in different cities. Two of the days between January 13 and January 17, 1994, were Saturday and Sunday. We reject the Bar's argument that the accused's written disclosure was not made contemporaneously with their oral disclosure.

■ We turn to the Bar's contention that the disclosure that the accused provided to Bramel was insufficient. As noted, DR 10-101(B)(1) requires "full disclosure," which is "an explanation sufficient to apprise the recipient of the potential adverse impact on the recipient, of the matter to which the recipient is asked to consent."

This court has addressed the meaning of the "full disclosure" requirement in several cases. In *In re Boivin*, 271

Or 419, 424, 533 P2d 171 (1975), for example, this court construed a previous iteration of the disciplinary rules that also required full disclosure, explaining:

> "To satisfy the requirement of full disclosure by a lawyer before undertaking to represent two conflicting interests, it is not sufficient that both parties be informed of the fact that the lawyer is undertaking to represent both of them, but he must explain to them the nature of the conflict of interest in such detail so that they can understand the reasons why it may be desirable for each to have independent counsel, with undivided loyalty to the interests of each of them."

Similarly, in *In re O'Byrne*, 298 Or 535, 548-49, 694 P2d 955 (1985), this court held that full disclosure includes "tell[ing] * * * what effects the differing interest may have upon the lawyer's ability to exercise his independent professional judgment."

The current version of DR 10-101(B) was adopted in 1988. Since then, this court has adhered to its prior standards in construing the full disclosure requirement contained in that rule. *See In re McKee*, 316 Or 114, 128, 849 P2d 509 (1993) (full disclosure under former DR 5-105(C) "requires a *full* disclosure of the possible effect of multiple representation on the exercise of the lawyer's independent professional judgment on behalf of each client") (emphasis in original).

In this proceeding, the only record of what the accused disclosed to Bramel is their letter of January 17, 1994. DR 10-101(B)(2) requires that an oral disclosure be "confirmed in writing." The word "confirm" means to "give new assurance of the truth or validity of: CORROBORATE." *Webster's Third New Int'l Dictionary* at 476. Accordingly, we find that the written disclosure that the accused made to Bramel reflected the oral disclosure that Griffin had made four days earlier. As noted, that letter stated that the accused had not entered into a retainer agreement with Stanley until "[a]fter we obtained Mac/Stanley's agreement to resolve our cases for a sum certain," and it stated that Stanley had "made a separate offer" to hire them. Rather than disclosing their conflict of interest, those statements suggested that there

was no conflict. The only statements in the letter that arguably could be viewed as disclosing the accused's conflict of interest to Bramel are the following:

> "Once we are retained by Mac, we will be unable to pursue claims like yours against Mac/Stanley in the future. We are disclosing this information to you because we feel that we have an obligation to do so[.]

> "Because this situation may appear to create a conflict of interest, we recommend that you seek independent legal advice to determine if consent should be given."

Nothing in the accused's letter to Bramel informed him that, on January 11, 1994, the accused had signed retainer agreements with Stanley and placed them in escrow. As explained above, as of January 11—when the accused agreed to be retained by Stanley before Bramel had agreed to the amount of the settlement that the lawyers had reached on December 20—the accused's interests were divided between at least one of their current clients, Bramel, and Stanley when it came to recommending whether Bramel should accept the settlement. In other words, beginning on January 11, 1994, it is possible that the accused's relationship with Stanley motivated them to recommend to Bramel a settlement that they would not have recommended—and that was not as favorable to Bramel as it could have been—if their loyalty had not been divided. Nothing in the letter informed Bramel that the accused's retainer agreements with Stanley contained indemnity provisions insuring that the accused would be protected fully by Stanley if Bramel decided to bring a claim against them because of the conflict of interest that they had acquired on January 11. A potential adverse impact of the indemnity provisions on Bramel was that, because of that protection, the accused's interests might be aligned with Stanley, not Bramel, their current client. The letter of January 17, 1994, fell short of the full disclosure required by DR 10-101(B).

■ ■ The accused contend that their disclosure satisfied the requirements of DR 10-101(B), because it led Bramel to believe that his lawyers had "switched sides" and had "betrayed" him during settlement negotiations and that Kuhling then had advised Bramel about the potential

adverse effects of the accused's conflict of interest. That argument is without merit. DR 10-101(B) requires the explanation that the *lawyer* gives to the *client* to be sufficient to apprise the client of the adverse consequences of the lawyer's conflict. The rule does not direct us to examine the client's subjective understanding of the lawyer's explanation, whether or not enhanced by consultation with an independent lawyer. Additionally, under DR 10-101(B), the issues of the sufficiency of the disclosure and consultation with independent counsel are separate: A lawyer must, when full disclosure is required under DR 5-101(A)(1), provide disclosure sufficient to apprise the client of adverse consequences *and* advise the client to seek independent counsel. DR 10-101(B) does not provide that advice from independent counsel may serve as a *post hoc* substitute for the lawyer's own disclosure. Moreover, the disclosure that the lawyer gives the client will affect the ability of independent counsel to assess the conflict and to advise the client. We hold that the accused violated DR 5-101(A) by continuing to represent Bramel after January 11, 1994, without having provided full disclosure to obtain Bramel's consent.

## C. *DR 1-102(A)(3)*

The accused also assign error to the trial panel's finding that they violated DR 1-102(A)(3), which provides:

> "(A)   It is professional misconduct for a lawyer to:
>
> "* * * * *
>
> "(3)   Engage in conduct involving dishonesty, fraud, deceit or misrepresentation."

The Bar's complaint alleged that the accused's failure to make full disclosure to Bramel also violated DR 1-102(A)(3) and that their failure to respond fully to the Bar's inquiry violated that rule. The trial panel majority agreed:

> "The accused[ ] had a fiduciary relationship with their clients that imposed on them a special duty of candor. The accused[ ] breached this duty when they failed to tell the Bramels about all aspects of the settlement. The failure to disclose the information to the Bramels constitutes misrepresentation by omission.

"* * * * *

"The majority finds that the accused['s] disclosure to their clients * * * were not ambiguous, but misleading. They would have been ambiguous if the Bramels and the Bar had all the information that the accused[ ] did. They are misleading due to the information omitted. Further, the majority finds that they [sic] accused made a misrepresentation to their clients when they stated in their January 17, 1994 letter that the defendants had made to them a separate offer to be retained. The accused knew that the offer was not separate from the settlement, but was in fact a condition of the settlement."

At the outset, we note that DR 1-102(A)(3) sets out different legal theories: dishonesty, fraud, deceit, and misrepresentation. The Bar's third amended complaint does not specify on which of those theories it intended to proceed. Although the better practice is to identify the theory or theories on which the Bar is proceeding, the trial panel resolved the DR 1-102(A)(3) charges on the theory of misrepresentation, and the accused respond to that theory before this court.

■ ■ This court has held that "misrepresentation" is a broad term that encompasses both affirmative misstatements and the nondisclosure of a material fact. *In re Leonard*, 308 Or 560, 569, 784 P2d 95 (1989). A fact is "material" if it is information that, if known, would be significant to the recipient. *In re Gustafson*, 327 Or 636, 649, 968 P2d 367 (1998). The misrepresentation need not be made with the intent to deceive or to commit fraud. *In re Hiller*, 298 Or 526, 533, 694 P2d 540 (1985).

■ In this case, the accused's January 17, 1994, letter to Bramel stated that Stanley had made a "separate" offer to retain them. The letter did not explain that, on January 11, the accused had signed retainer and escrow agreements.

When Richards proposed adding the retainer provision to the settlement documents, Griffin believed that the parties no longer had a meeting of the minds "and therefore we [didn't] have a settlement agreement." The accused were upset by the proposal to include the retainer provision and understood that Stanley considered that provision to be a condition of the settlement. Nonetheless, they later agreed to

that proposal as a part of the global settlement. Their statement to Bramel that Stanley had made a "separate" offer of retention was an affirmative misstatement.

We turn to the accused's omissions. On January 10, Griffin had written to the other plaintiffs' lawyers that he planned to inform a trial court in California about the proposed retainer agreement, which he described as "unethical and illegal" as well as "unacceptable and unenforceable." The accused knew that the retainer proposal created a conflict of interest, and Griffin specifically asked Riemer how much information he and Brandt had to share with their clients about their relationship with Stanley. When the accused signed the retainer and escrow agreements on January 11, they apparently believed that they had discovered a way to avoid the ethical issues associated with the agreement to work for Stanley. However, by failing to inform Bramel that they had signed those documents, the accused gave Bramel an incomplete understanding of the conflict of interest that was created by the retainer provision. Knowing *when* the accused agreed to work for Stanley was a fact that was material to Bramel's assessment of how he should respond to the conflict of interest and whether he should accept the accused's recommendation that he settle his claim against Stanley for $133,045.31. Knowing that the accused were indemnified fully by Stanley for any claim that Bramel might bring against them was material to Bramel's decision whether he should rely on the accused's advice in recommending that he accept the settlement. The accused violated DR 1-102(A)(3) by not disclosing material facts to Bramel.

We turn to the accused's argument that the trial panel erred in finding that they violated DR 1-102(A)(3) in their letter of April 21, 1994, to Bar counsel Cooper responding to Bramel's complaint.[14] In its complaint, the Bar alleged:

---

[14] Griffin wrote another letter to Cooper on June 15, 1994, which Brandt "joined" by reference in a letter to Cooper on June 16. Those letters responded to a letter that Bramel had written to Cooper on May 30, 1994, in response to the accused's letter of April 21. Griffin's June 15 letter reiterated matters he had discussed in his April 21 letter, and emphasized that, in Griffin's view, he and Brandt had "met the disclosure requirements of DR 10-101 and other ethical requirements." For purposes of our analysis whether the accused violated DR 1-102(A)(3) by making affirmative misrepresentations of fact, we focus only on the letter of April 21, 1994. The letters of June 15 and 16 contain neither additional

"The Accused * * * made the following affirmative misrepresentations of fact to the Bar:

"a) That [they] had not agreed to work for Mac Tools while the Bramels' case was still pending;

"b) That a retainer with Mac Tools had not been discussed until the settlement of the Bramels' case was finalized; and

"c) That the Bramels had been fully advised of all aspects of the settlement negotiations with Mac Tools."

The trial panel majority concluded that the accused violated DR 1-102(A)(3) in those respects.

The accused's April 21 letter to Cooper stated, in part, that they had apprised Bramel of the status of his case throughout the global settlement negotiations and that Stanley did not offer to retain plaintiffs' counsel until "after the settlement was finalized." The letter also stated that,

"[p]rior to finalizing the settlement, all plaintiff's [sic] counsel embarked on significant research into potential ethical problems. This research included a call by me to bar counsel, George Reimer, [sic] on January 11, 1994. During that discussion, I specifically spoke with Mr. Reimer [sic] about Disciplinary Rules 5-107, 5-110(A) and 10-101(B). All plaintiffs' counsel were careful in structuring a settlement which would maximize benefit to our clients and avoid ethical violations. It was only after much discussion among counsel that the structure of the agreement was reached. All counsel was [sic] confident, based upon independent research and input from other attorneys, that the settlement structure met ethical standards."

According to the accused, the allegations in the second cause of complaint are based on statements in their April 21 letter that have been taken out of context. We have reviewed their letter and disagree. The accused's letter to Cooper stated unequivocally that they did not agree to work for Stanley until "after" the settlement was finalized and that Stanley did not offer to retain the plaintiffs' counsel until after the settlement had been finalized. Those statements

---

misrepresentations of material fact nor retractions of any statement that was made in the April 21 letter.

would have been true if the plaintiffs' claims against Mac Tools had been settled on December 20, 1993. However, as noted, the December 20 agreement was subject to the approval of the individual plaintiffs. When Griffin received Richards' retainer proposal on January 6, 1994, he believed that there no longer was a "meeting of the minds" among the lawyers. Griffin also believed that Richards was proposing that the retainer provision was a condition of settlement, and he believed that the provision was both unethical and illegal. Brandt attended an emergency meeting in Chicago on January 11 to resolve whether and how to incorporate the retainer provision into the settlement agreement. The accused did not send a copy of the proposed settlement to Bramel until January 17, and Bramel did not sign it until January 28. The accused's statements to Cooper that they did not agree to work for Stanley while Bramel's case still was pending and that Stanley did not offer to retain them until after the settlement had been finalized simply were not true. The accused's assertion in their letter that they had kept Bramel "fully advised of all aspects of the settlement negotiations" with Stanley also was not true. The accused did not tell Bramel that, on January 6, 1994, Stanley had proposed adding a retainer provision to the settlement agreement and that that provision was a condition of the settlement. Neither did the accused tell Bramel that, on January 11, before the settlement agreement had been signed by all their clients, the accused had signed retainer and escrow agreements. All three statements that form the basis of the Bar's complaint were factual misrepresentations. All three statements were material to the Bar's inquiry into Bramel's complaint and whether to proceed with a formal investigation. The accused violated DR 1-102(A)(3) by making affirmative misrepresentations of material fact to the Bar in their letter of April 21, 1994.

## D. *DR 1-103(C)*

Finally, the accused assign error to the trial panel's finding that they violated DR 1-103(C), which provides:

> "A lawyer who is the subject of a disciplinary investigation shall respond fully and truthfully to inquiries from and comply with reasonable requests of a tribunal or other

authority empowered to investigate or act upon the conduct of lawyers, subject only to the exercise of any applicable right or privilege."

The Bar's complaint alleges that "the Accused failed to respond truthfully to inquiries from authorities empowered to investigate or act upon the conduct of lawyers." Specifically, the Bar charges that the accused did not respond fully and truthfully to the inquiries of Hankin, the LPRC investigator. The trial panel reasoned that the accused had violated the rule, because the rule "places the burden on the accused to provide information, not the Bar to ferret it out."

The gravamen of the Bar's allegation is that the accused failed to disclose to Hankin the January 11, 1994, retainer agreement and escrow arrangements which, the Bar contends, the accused knew "were, at best, questionable." According to the Bar, "it is questionable whether the Accused ever actually made their documents physically available to Hankin." We conclude that the Bar has failed to establish by clear and convincing evidence that the accused failed to make the retainer agreement and escrow instructions of January 11 available to Hankin.

As noted, Griffin gave his file on Bramel to Hankin when he and Brandt met with Hankin in Griffin's office in March 1995. Hankin did not look through it. Neither did she examine Bramel's file that Brandt had made available to her when she met with him in Salem. When Hankin met with the accused, she had a copy of the settlement document that contained paragraph 7 regarding retention of counsel. However, she did not ask the accused about the retainer provision. Hankin testified that, at that time, her investigation focused mostly on Bramel's complaint about the amount of the accused's fee and their alleged conflict of interest.

By its terms, DR 1-103(C) requires an accused to "respond fully and truthfully to inquiries." We disagree with the trial panel's view that the rule "places the burden on the accused to provide information, not the Bar to ferret it out." Rather, the rule requires an accused to respond "fully and truthfully" to *inquiries*. Hankin never inquired about the retainer agreements and the escrow arrangement. The accused made their files on Bramel, which contained copies of

those documents, available to Hankin. In addition the accused suggested that Hankin contact Riemer, the mediator who served as the escrow agent, and counsel for Stanley. Hankin did not look through the files that the accused provided her. Neither did she contact Riemer or the mediator. On this record, we conclude that the Bar has not met its burden of proving by clear and convincing evidence that the accused violated DR 1-103(C).

## III.  SANCTION

Having determined that the accused violated DR 2-108(B), DR 5-101(A)(1), and DR 1-102(A)(3), we turn to the question of the appropriate sanction. The trial panel recommended that each of the accused be suspended for six months. The Bar requests that this court suspend each of the accused for at least one year. The accused argue that no sanction or, at most, a reprimand, is warranted in this case.

■ This court refers to the American Bar Association's *Standards for Imposing Lawyer Sanctions* (1991) (amended 1992) (ABA Standards) for guidance in determining the appropriate sanction for lawyer misconduct. *In re Schaffner*, 323 Or 472, 918 P2d 803 (1996). According to the ABA Standards,

> "The purpose of lawyer discipline proceedings is to protect the public and the administration of justice from lawyers who have not discharged, will not discharge, or are unlikely properly to discharge their professional duties to clients, the public, the legal system, and the legal profession."

ABA Standard 1.1; *see In re Huffman*, 328 Or 567, 587, 983 P2d 534 (1999) (noting agreement with statement).

■ This court first considers three factors to determine the appropriate sanction: the duty violated; the accused lawyer's mental state; and the actual or potential injury caused by the accused lawyer's misconduct. ABA Standard 3.0. We then examine any aggravating or mitigating circumstances to determine if the sanction should be adjusted. *In re Devers*, 328 Or 230, 241, 974 P2d 191 (1999); ABA Standard 3.0. Finally, we look to Oregon case law. *Devers*, 328 Or at 241.

In this case, the accused violated their duty to their client by failing to avoid conflicts of interest, ABA Standard 4.3, and by lacking candor in their dealings with their client, ABA Standard 4.6. The accused also failed to maintain their personal integrity by making misrepresentations to their client and to the Bar. ABA Standard 5.1.

As to the accused's mental state, the Bar contends that all the accused's acts were intentional, that is, all were done with a "conscious objective or purpose to accomplish a particular result." ABA Standards at 7 (defining "intent"). According to the Bar,

> "the Accused intentionally provided their clients with untimely, incomplete and misleading information, hoping to push the settlement through while at the same time disguising their own unethical conduct. When their client[ ] complained to the Bar, the Accused intentionally provided incomplete and misleading information to Bar investigators in the hopes of persuading the Bar to dismiss the Bramels' complaint."

We agree that the accused acted intentionally. When the accused signed the retainer and escrow agreements on January 11, they created a conflict of interest that they had a duty to disclose fully to Bramel. They also had a duty to apprise Bramel of the potential adverse impact that the conflict could have on him. However, beginning on January 11, 1994, the accused's loyalty was divided between Bramel and Stanley, they intentionally misrepresented facts and withheld information from Bramel to mask their conflict of interest. When Bramel complained to the Bar, the accused made intentional misrepresentations in response to Cooper's letter of inquiry. The accused intended their misrepresentations to persuade the Bar not to conduct an investigation of any alleged ethical misconduct.

We turn to whether the accused's conduct caused injury. "Injury" includes actual or potential harm to a client, the public, the legal system, or the legal profession. ABA Standards at 6-7. The Bar has not demonstrated that the accused caused actual harm to Bramel by securing for him a settlement amount that was less than Bramel would have received if the accused had not agreed to work for Stanley in

connection with the global settlement. However, there is the potential for considerable harm when a lawyer violates DR 2-108(B) by agreeing to work for the opposing side in connection with the settlement of a case, because such an agreement creates the possibility that the lawyer's professional judgment will be affected and that the lawyer's loyalty to the current client will be impaired. Such an agreement also creates the possibility that the settlement of the current case does not reflect the value of the claims at issue in that case. That is, parties might be willing to pay more, or to accept less, to settle a case if the settlement includes an agreement that all lawyers involved will work for the same side in the future.

The accused's letter to Cooper of April 21, 1994, caused both actual and potential harm to the legal system. The effectiveness of the Bar's disciplinary system, and public confidence in it, assume that lawyers do not make factual misrepresentations in response to Bar inquiries. Cooper was entitled to rely on the accused's response to her inquiry in deciding whether to dismiss Bramel's complaint or to have the complaint investigated. If the accused's misrepresentations had persuaded Cooper to dismiss Bramel's complaint, the lawyer discipline system would have been compromised. The accused's misrepresentations of material facts also made Hankin's task more difficult, because she was unsure what she was looking for in her investigation.

The accused's misconduct implicates several ABA Standards. ABA Standard 4.31 provides:

"Disbarment is generally appropriate when a lawyer, without the informed consent of [a] client:

"(a) engages in representation of a client knowing that the lawyer's interests are adverse to the client's with the intent to benefit the lawyer or another, and causes serious or potentially serious injury to the client."

ABA Standard 4.32 provides:

"Suspension is generally appropriate when a lawyer knows of a conflict of interest and does not fully disclose to a client the possible effect of that conflict, and causes injury or potential injury to a client[.]"

ABA Standard 4.61 provides:

"Disbarment is generally appropriate when a lawyer knowingly deceives a client with the intent to benefit the lawyer or another, and causes serious injury or potential serious injury to a client."

ABA Standard 4.62 provides:

"Suspension is generally appropriate when a lawyer knowingly deceives a client, and causes injury or potential injury to the client."

ABA Standard 5.11 provides, in part:

"Disbarment is generally appropriate when:

"* * * * *

"(b)  a lawyer engages in * * * intentional conduct involving * * * misrepresentation that seriously adversely reflects on the lawyer's fitness to practice."

ABA Standard 5.13 provides:

"Reprimand is generally appropriate when a lawyer knowingly engages in * * * conduct that involves * * * misrepresentation and that adversely reflects on the lawyer's fitness to practice law."

Drawing together the factors of duty violated, mental state of the accused, and injury caused, either a suspension or disbarment could be appropriate in this case. However, because the Bar has failed to establish that the accused's misconduct caused actual harm to Bramel, we make an initial determination that a lengthy suspension is the appropriate sanction in this case. We turn to the fourth factor, aggravating and mitigating circumstances.

Several aggravating factors are present. In misrepresenting facts to Bramel and to the Bar, the accused acted with a dishonest or selfish motive, namely, not wanting to advise Bramel of their conflict of interest and not wanting the Bar to pursue an investigation in response to Bramel's complaint. ABA Standard 9.22(b). The accused engaged in a pattern of misconduct in their incomplete disclosures to both Bramel and to the Bar. ABA Standard 9.22(c). The accused committed multiple offenses, ABA Standard 9.22(d), and

they refuse to acknowledge the wrongful nature of their conduct, ABA Standard 9.22(g). Both the accused have substantial experience in the practice of law. ABA Standard 9.22(i). Finally, Brandt has a prior disciplinary offense consisting of a letter of admonition in 1993 for a former client conflict of interest and continuing to represent a party without making full written disclosures to each client. ABA Standard 9.22(a). We discuss the significance of that letter later in this opinion.

The only mitigating factor in this case is that Griffin has no prior disciplinary record. ABA Standard 9.32(a).

We next consider this court's case law. All the ethical violations in this case stem from the accused's violation of DR 2-108(B). As noted, whether DR 2-108(B) is violated when a lawyer agrees, in connection with the settlement of a case, to "indirect" restrictions on the future practice of law was a question of first impression in this case. If that were the sole issue here, we might hold that, because this was the first time that the issue has been litigated in a disciplinary case, the appropriate sanction would be a public reprimand. *See In re Banks*, 283 Or 459, 482, 584 P2d 284 (1978) (because novel aspect of case required court to "plow some new ground," public reprimand was appropriate sanction). However, having violated DR 2-108, the accused then attempted to disguise and to justify that violation, resulting in violations of the full disclosure requirement of DR 5-101(A) and misrepresentations of material fact both to Bramel and to the Bar, in violation of DR 1-102(A)(3).

This court has distinguished between cases in which the lawyer is guilty only of a conflict of interest and cases in which the conflict is aggravated by fraud, dishonesty, or misappropriation of funds, or there are many aggravating factors. *See In re Moore*, 299 Or 496, 510, 703 P2d 961 (1985) (drawing that distinction). In the former category of cases, the sanctions have ranged from a public reprimand to a suspension of less than one year. *Id.* However, when the lawyer's conflict of interest has been aggravated by fraud, dishonesty, or misappropriation of funds, or there were many aggravating factors, the sanction always has involved at least a suspension. Some suspensions have exceeded one year and, in one case, this court disbarred the lawyer. *See In re O'Byrne*,

298 Or 535, 551, 694 P2d 955 (1985) (so stating); *see also In re Wittemyer*, 328 Or 448, 462, 980 P2d 148 (1999) (providing additional examples of sanctions imposed for violation of conflict-of-interest rules aggravated by other circumstances). However, this court has rejected the argument that there is a "minimum period of suspension" that always is appropriate in the latter category of cases. *Wittemyer*, 328 Or at 462. Rather, the appropriate sanction in each case depends on individual facts and circumstances. *Id.*

As noted, in this case, the accused acted intentionally when they violated DR 2-108(B) by entering into the retainer agreement in connection with the settlement of Bramel's claim against Stanley. They compounded that violation by not disclosing fully their conflict of interest to Bramel and by making material misrepresentations of fact both to Bramel and to the Bar, in violation of DR 1-102(A)(3).

In addition, this case involves several aggravating factors, and the sole mitigating factor affects only Griffin. The aggravating factors heavily outweigh Griffin's one mitigating factor. *Cf. In re Morris*, 326 Or 493, 505-06, 953 P2d 387 (1998) (four-month suspension for violation of conflict-of-interest rule where mitigating factors outweighed aggravating factors). Our prior case law confirms that a lengthy suspension is warranted. We conclude that Griffin should be suspended for 12 months.

With respect to Brandt, we conclude that a longer period of suspension is warranted. This court has held that, if the misconduct that gave rise to an earlier letter of admonition involved the same or similar type of misconduct at issue in the present case, then it is appropriate to consider the letter in determining an appropriate sanction. *In re Cohen*, 330 Or 489, 500, 8 P3d 953, 959 (2000). As noted, in 1993, Brandt received a letter of admonition for a former client conflict of interest and continuing to represent a party without making full written disclosures to each client. This case involves a current client conflict of interest and failure to make full disclosure, which is sufficiently similar in nature that we consider it as an aggravating factor in this case. *Id.* at 501. Brandt's 1993 letter of admonition is his sole past instance of misconduct. However, he became involved in the conflict of

interest that is at the core of this proceeding in January 1994, soon after having been warned against engaging in behavior that creates a conflict of interest. *See In re Jones*, 326 Or 195, 200, 951 P2d 149 (1997) (relative recency of prior instance of misconduct and timing of current offense in relation to prior offense important in determining significance of prior misconduct). The recent admonition to avoid client conflicts and to make full disclosures apparently did not deter Brandt from becoming involved in the conflict of interest that is at the core of the other disciplinary violations that are at issue in this case. *See In re Bridges*, 302 Or 250, 254-55, 728 P2d 863 (1986) (one purpose of sanction is to deter misconduct). Under those circumstances, Brandt's prior letter of admonition is an aggravating factor that warrants a longer period of suspension than the suspension that we have imposed on Griffin. We conclude that Brandt should be suspended from the practice of law for 13 months.

Griffin is suspended from the practice of law for 12 months, and Brandt is suspended from the practice of law for 13 months. The suspensions shall commence 60 days from the filing of this decision.

**KULONGOSKI, J.,** concurring in part and dissenting in part.

I concur in the majority's holding that the accused did not violate Disciplinary Rule (DR) 1-103(C). I respectfully dissent, however, from the majority's holding that the accused violated DR 5-101(A)(1) and DR 1-102(A)(3). Additionally, although I concur in the majority's holding that the accused violated DR 2-108(B), I disagree with the majority's conclusions concerning the appropriate sanction for that violation. The issue whether a lawyer violates DR 2-108(B) when a lawyer agrees in connection with settlement of a case to "indirect" restrictions on the future practice of law never has been litigated previously in a disciplinary case in Oregon. Accordingly, I would hold that the appropriate sanction for both the accused is a reprimand.

The accused in this disciplinary proceeding are entitled to a presumption that they are innocent of the charges.

*In re Jordan*, 295 Or 142, 156, 665 P2d 341 (1983). To overcome that presumption, the Bar must prove the alleged misconduct by clear and convincing evidence. *In re Allen*, 326 Or 107, 109, 949 P2d 710 (1997); Bar Rule of Procedure (BR) 5.2. "Clear and convincing evidence means that the truth of the facts asserted is highly probable." *In re Whipple*, 320 Or 476, 478, 886 P2d 7 (1994) (internal quotation marks omitted).

## FACTS

The facts in this proceeding are of the utmost importance, and, because I disagree with most of the majority's interpretation of those facts, I believe that it is necessary to give my own explanation of them here. Reviewing the record *de novo*, I would find the following facts.

Both the accused have been lawyers in Oregon for more than 20 years. Brandt began representing former distributors against hand-tool manufacturers in the late 1980s. Griffin, whose practice emphasizes plaintiffs' complex business fraud litigation, first associated as co-counsel with Brandt in the early 1990s when Brandt's practice began to grow in volume and complexity, due, at least in part, to an $8.9 million jury verdict that Brandt had obtained against a hand-tool manufacturer called Snap-On Tools in 1989. In 1992, Brandt and Griffin litigated a case against another hand-tool manufacturer, Mac Tools, that resulted in a $2.4 million verdict. Due to the publicity generated by both those multimillion dollar verdicts, by fall 1993, the accused were handling 49 claims against Mac Tools. One of those claims belonged to Eric Bramel and his wife, Audrey.[1]

Bramel operated a Mac Tools distributorship in Spokane, Washington, from 1991 to 1992. Mac Tools ultimately terminated that distributorship, after which Bramel sought legal counsel. A former Snap-On Tools client referred Bramel to Brandt, and, in 1992, both the accused agreed to represent him.

As noted by the majority, Bramel initially had hoped to net $1.5 million from his claim. From the outset, however,

---

[1] Unless otherwise noted, all references to "Bramel" are to Eric Bramel. All references to "the Bramels" are to both Eric Bramel and his wife.

Bramel conceded that his total out-of-pocket loss was approximately $142,000. In his first letter to Bramel in 1992, Brandt had cautioned Bramel that his prior $2.4 million verdict against Mac Tools included a large punitive damages award and that "Washington law does not recognize punitive damages."[2] In the letter, Brandt also stated that, because Mac Tools had recruited Bramel in California, Brandt would "try to argue that California law applie[d]" to Bramel's punitive damages claim.

Although the accused began drafting a complaint for Bramel's claims, they did not file that complaint. Instead, Bramel's claims against Mac Tools were to be included in larger settlement negotiations that began in March 1993 between Mac Tools and plaintiffs' counsel throughout the country, including the accused. In April 1993, Brandt informed Bramel that a realistic settlement demand would be $275,000, and Bramel reluctantly agreed. Brandt testified before the trial panel that that demand was higher than what he considered to be the actual value of Bramel's claim, but that making higher demands was part of the negotiation strategy.

In August 1993, plaintiffs, including Bramel, participated in "mediation interviews" as part of the settlement process with Mac Tools. The purpose of those interviews was to allow Mac Tools's lawyers to interview individual plaintiffs off-the-record and evaluate their claims. Following his interview, Mac Tools offered Bramel $26,000, minus $6,300 that Mac Tools claimed Bramel still owed for his tool inventory. Counsel for Mac Tools also informed Griffin that they were prepared to try Bramel's case because they did not believe that his claim had significant value. Griffin recommended that Bramel reject the "unrealistically low" settlement offer, which he did. Subsequently, however, Bramel's personal

---

[2] The Washington Supreme Court consistently has not allowed punitive damages, determining that their award would be contrary to public policy. *Dailey v. North Coast Life Ins. Co.*, 129 Wash2d 572, 574, 919 P2d 589 (1996) (citing *Spokane Truck and Dray Co. v. Hoefer*, 2 Wash 45, 50-56, 25 P 1072 (1891)). In Washington, punitive damages are allowed only when expressly authorized by the Washington legislature. *Winchester v. Stein*, 135 Wash2d 835, 858, 959 P2d 1077 (1998).

financial situation began to worsen, and he began to lower his settlement demand.

By fall 1993, when a second round of settlement negotiations began between Mac Tools, its parent company, The Stanley Works (collectively "Stanley"), and plaintiffs' counsel, Bramel had reduced his settlement demand to $165,000. Of the approximately 115 claims involved in those negotiations, Brandt and Griffin were representing 49 clients, including Bramel. At the second "global settlement" meeting on November 5, 1993, Stanley proposed an $8 million settlement offer, which the plaintiffs rejected. The plaintiffs' counsel countered with an offer to settle all claims for approximately $18 million—an aggregate sum of their individual clients' demands. Stanley then increased its offer to $9.5 million, but plaintiffs rejected that offer as well.

It was during the November 5, 1993, meeting that Weddle, a vice-president for The Stanley Works, first raised the subject of Stanley retaining the plaintiffs' lawyers to represent Stanley in the future. Weddle implied that, if the plaintiffs' lawyers agreed to his proposal, their retainer fees would be substantial, stating: "We can make you very rich men." Griffin, who was present at that meeting, interpreted the proposal as "bribery" and an attempt to buy them off. The plaintiffs' counsel rejected the proposal and walked out of the meeting. Afterward, they informed Stanley that they would not discuss the employment issue while settlement negotiations were ongoing. Stanley agreed, and a third global settlement meeting was scheduled for December 20, 1993.

No mention of a retainer agreement was made at the December 20, 1993, meeting, and the plaintiffs' counsel believed that it was no longer an issue. At that meeting, the parties agreed to settle all the claims for $13.32 million, subject to approval by the individual plaintiffs. As mentioned by the majority, the individual settlement amounts offered to the accused's clients reflected approximately 80 percent of their latest demands. Under the terms of the proposed settlement, Bramel would receive $133,045.31 and Mac Tools would forgive the sum of $6,300 that it claimed that Bramel owed. In fact, in Bramel's case, that offer represented *more* than 80 percent of his latest demand ($165,000) and was

almost seven times greater than Mac Tools's original offer to Bramel ($26,000 minus $6,300).

Immediately after the December 20, 1993, meeting, Brandt and Griffin began contacting each of their clients to inform them of the proposed settlement amounts. Brandt testified that he believed that all 49 clients had agreed to the settlement figures by approximately January 4, 1994, although neither he nor Griffin remember talking to Bramel in particular.

On January 4, 1994, counsel for Stanley faxed drafts of proposed settlement forms to Brandt. The forms contained boilerplate confidentiality and noncompetition provisions that essentially required the plaintiffs who agreed to settle also to agree that the terms of the agreement would be confidential and that they would not "voluntarily" cooperate with other potential claimants. None of the forms referred to Stanley retaining the plaintiffs' counsel. The next day, however, the retainer issue resurfaced in a telephone conversation between Richards, one of the lawyers for Stanley, and Wagner, another plaintiffs' lawyer involved in the global settlement negotiations. Wagner, who was considered by the rest of the plaintiffs' counsel as the designated "point man" because of his proximity to Richards,[3] responded to Stanley's "resurrection" of the retainer issue with a letter dated January 6, 1994. When Wagner wrote that letter, no specific retainer agreement had been proposed since the November 5, 1993, meeting. Consequently, in his letter, Wagner expressed his concern over the telephone conversation in which the retainer issue had resurfaced, and he reiterated that the settlement reached on December 20, 1993, "was not contingent upon any agreement to represent or not represent Stanley or Mac [Tools], post settlement." He also indicated that the drafts of the proposed settlement forms faxed on January 4, 1994—that made no mention of being retained by Stanley— were acceptable to the plaintiffs' lawyers. The accused agreed with Wagner's assessment of the situation.

The same day, in response to Wagner's letter, Richards faxed to plaintiffs' lawyers a new paragraph that she

---

[3] Both Wagner and Richards practiced law in Ohio.

proposed be inserted into the settlement agreements. The paragraph began:

> "#. *Retention of Counsel.* Distributor understands that, *upon execution of this Agreement resolving all matters and disputes between the Distributor and Mac Tools,* counsel for the Distributor *will be retained* by Mac Tools \* \* \*."

(Emphasis added.) Also attached to the proposed amendment was a copy of a case that Richards asserted "indicates that it is ethical and proper to have a retention agreement as part of a settlement agreement."

In reaction, the plaintiffs' counsel began discussing whether and how it would be possible to enforce the settlement agreement reached on December 20, 1993, without the retainer provision. One option that they discussed was to file a lawsuit to enforce the December 20 settlement agreement. That option, however, would delay a conclusion to the suit and would impose additional expense on their clients. The plaintiffs' counsel also were concerned about the settlement agreement breaking down entirely. That concern was heightened by their belief that the value of their clients' claims was beginning to decrease and the strength of their positions beginning to weaken as a result of reports of similar cases in other parts of the country in which plaintiffs' lawyers "were not getting good results." Additionally, Stanley recently had obtained a summary judgment in a similar case, and Stanley's lawyers had developed greater confidence about their ability to obtain similar judgments in other jurisdictions.

On January 11, 1994, Brandt and other plaintiffs' counsel met once more with Stanley in Chicago. Weddle began the meeting by congratulating the plaintiffs' counsel for reaching a settlement for their clients—reaffirming their belief that the settlement amount "was a done deal." Brandt remembers that Weddle then stated, "Now that that's done and the case is settled, we want to retain you." The retainer agreement proposed by Stanley on this occasion, however, was different from the agreement previously rejected by the plaintiffs' counsel on November 5, 1993. Stanley's counsel explained that one of the reasons that Stanley wanted to retain the plaintiffs' counsel was to avoid similar deceptive

practices suits being filed against them in the future. To accomplish that objective, Stanley proposed that the plaintiffs' counsel sign agreements to be retained by Stanley for the balance of 1994 and, in return, Stanley would pay each of them a nonrefundable retainer fee of $10,000. Under Stanley's proposal, once signed, the agreements would be placed in escrow and would not go into effect until *after* all plaintiffs had executed their individual settlement agreements, all settlement amounts had been paid, and all pending actions had been dismissed. The plaintiffs' counsel understood that, under that proposed arrangement, if one of their clients did not consent to future retainer by Stanley, none of the retainer agreements would go into effect. The plaintiffs' counsel also understood that those clients who did agree still would receive their agreed settlement amounts even if other clients did not and the retainer agreements never took effect.

During the meeting, Brandt called Griffin, who was then in Portland, to discuss the new retainer proposal. Griffin, on the same day, called George Riemer, the Bar's General Counsel, to discuss the ethical implications of the arrangement. Both Griffin and Riemer remember discussing DR 2-108(B) and whether retainer in connection with settlement of a case that was still pending might be possible. Griffin's notes taken during that conversation—Riemer took no notes—reflect that he and Riemer also discussed the potential applications of DR 5-107(A), DR 5-101(A), DR 10-101(B), and, specifically, what "full disclosure" meant in that context. Riemer told Griffin that it was "hypothetically possible" to proceed with the proposed arrangement as long as he and Brandt complied with the disclosure and consent provisions.

Based on that advice, on their desire to reach a prompt resolution of their clients' claims, and on their concern that, "if they did not accept the offer * * *[,] the settlement might be in jeopardy," the accused agreed to Stanley's retainer proposal. Both the accused testified that they would not have done so if Riemer had told them that the proposal was improper. Once signed, the agreements were placed in escrow with the mediator, pending execution of the settlement agreements by the individual plaintiffs.

I believe that it is necessary to address here the majority's finding that Bramel had not agreed orally to the settlement offer "until after January 11, 1994." 331 Or at 119. As I read the record, it is at least equally possible that Bramel had, in fact, agreed to the settlement offer before January 6 or, at the very latest, before the January 11 meeting. It is critical, I believe, to differentiate between Bramel's knowledge and acceptance of the settlement *amount, i.e.,* the offer made by Stanley on December 20, 1993, to settle his case for $133,045.31, and his knowledge and acceptance of the settlement *agreement, i.e.,* the agreement contained in the proposed settlement forms that included not only the settlement amount but also a provision acknowledging the accused's retainer by Stanley.

The only evidence in the record concerning when Bramel agreed to the $133,045.31 settlement *amount* is the testimony of Bramel, and both the accused before the trial panel. Interestingly, the trial panel did not reach a finding on that point. *Cf. In re Trukositz,* 312 Or 621, 629, 825 P2d 1369 (1992) (when credibility of witness is material issue, court substantially relies on trial panel's findings of fact). Notably, Bramel's testimony conflicts with both the accused's. My own review of the record persuades me that Bramel's testimony about when he agreed to the settlement amount is suspect for three reasons. First, Bramel noted that he is "not very good" with dates and could not remember exactly when he talked with the accused. Second, Bramel testified that he first learned of the December 20, 1993, settlement amount when he received a letter from the accused on January 17, 1994. The record, however, is clear that Bramel had discussed the settlement amount with Griffin sometime before January 11 or, at the very latest, on January 13. Third, Bramel testified that *three* things concerned him about the settlement agreement. In his initial complaint to the Bar about the accused's conduct, however, Bramel noted only *two* concerns with the settlement agreement. The concern conspicuously "missing" in Bramel's original complaint involved his "concern" about the actual settlement *amount.* Based on the foregoing, I reject Bramel's testimony concerning the date on which he agreed to the settlement *amount. See generally* UCJI 10.04

(when person intentionally gives false testimony in part, person's testimony may be distrusted in its entirety).

Although Bramel testified that, prior to January 17, 1994, he had not told Griffin that he would accept the settlement *agreement*, he never testified directly that he previously had not agreed to the settlement *amount*. Brandt, on the other hand, testified that, by approximately January 4, he believed that he and Griffin had contacted all their clients regarding the acceptability of the settlement amounts negotiated at the meeting on December 20, 1993. Although Brandt also testified that, on January 6 he was concerned that they might have had some remaining clients to contact, he also testified that, when he attended the meeting in Chicago on January 11 he believed that Griffin had contacted Bramel and had obtained authority to settle Bramel's case for the proposed settlement amount. That testimony is consistent with the plaintiffs' counsel's perspective going into that meeting, *viz.*, that a settlement already had been reached. It also is consistent with Weddle's announcement to the plaintiffs' counsel at the start of that meeting: "Now that * * * the case is settled, we want to retain you."

Finally, Griffin's testimony does not conflict with Brandt's regarding when Bramel agreed to the settlement *amount*. Griffin's statement that he "may have mentioned" the settlement to Bramel prior to a conversation he had with Bramel on January 13, 1994, but that he specifically remembers talking about "it" to Bramel on January 13, was in response to the following question by the Bar:

"Is January 13, 1994, the first date that you called Mr. Bramel in an attempt to tell him that there had been a settlement *and* to make full disclosure to him of the potential conflict of interest that you were in?"

(Emphasis added.) In other words, Griffin was confident that he had discussed both the settlement amount *and* the potential conflict with Bramel on January 13, 1994. That does not mean, however, that he had not received Bramel's approval of the settlement *amount* before January 11. Griffin testified

that he had "numerous conversations" with Bramel concerning the settlement *amount* prior to their conversation on January 13. Griffin also testified that, in general, his conversations with his clients following the January 11 meeting had followed an unwritten "script" in which he would discuss, among other things, the amount *and* the potential conflict.

As detailed above, the record does not support a finding that it was *highly probable* that Bramel had *not* agreed to the settlement *amount* before January 11, 1994. The absence of direct evidence on that issue does not support the majority's conclusion that, on January 11, when the accused agreed to be retained by Stanley, Bramel had not agreed to the settlement amount reached on December 20, 1993. 331 Or at 119. In fact, apart from Bramel's testimony, the accused's testimony demonstrates that all of their clients, including Bramel, had approved the settlement amounts offered by Stanley before January 11. *See In re Gildea*, 325 Or 281, 296-97, 936 P2d 975 (1997) (testimony of accused lawyer, if court deems it credible, is sufficient to establish facts). Accordingly, I find that Bramel had agreed to the *amount* of the proposed settlement before January 11.

Following the events of January 11, 1994, the accused began contacting each of their 49 clients to discuss the execution of the individual settlement agreements. Griffin specifically remembered talking to Bramel about the settlement agreement and the potential conflict on the phone on January 13, 1994. During that conversation, Griffin also recommended to Bramel that he seek independent legal advice concerning consent to the conflict.

Following their conversation on January 13, 1994, Griffin and Bramel had several additional discussions about Bramel's case and about the settlement agreement. Bramel testified before the trial panel that at that time (January 1994) he was "in need of the settlement money" and was not in a position financially to reject the settlement offer and take his case to trial. Griffin testified before the trial panel that, because of the time and expense that would have been involved in trying the case and, because he did not think that Bramel would recover as much from a trial as he had in the

settlement process, he had encouraged Bramel to accept the $133,045.31 settlement offer.[4]

On January 17, 1994, the accused mailed a letter to their clients, including Bramel, regarding the retainer agreement and seeking their clients' signatures on documents consenting to the potential conflict of interest and approving the settlement agreements. The letter also advised the clients to consult independent counsel "to determine if consent should be given." See 331 Or at 124-25 (setting out text of January 17 letter).

Bramel does not remember talking to Griffin on January 13, 1994. He claims that he first learned that his lawyers were "switching sides" when he received the letter mailed on January 17. According to Bramel, it was at that time that he decided to consult independent counsel for advice. Bramel's first telephone call was to his accountant in Idaho. His accountant referred him to a lawyer in Idaho who, because he was not licensed to practice law in Washington, ultimately referred Bramel to Kuhling, a lawyer in Spokane, Washington. Kuhling's records indicate that Bramel called him for the first time on January 18, 1994. During that conversation, Bramel informed Kuhling that he had been advised to seek independent counsel to review a proposed settlement agreement.[5] The two met in person for the first time on January 24.

At some point between January 13 and January 26, 1994, Griffin learned that Bramel had contacted another lawyer. As a result, the accused obtained an extension of the

---

[1] Brandt also testified that his assessment of the value of the Bramels' case had become less favorable as his understanding of the details involved had developed. Brandt speculated that, based on Washington law and recent decisions by the United States Supreme Court, the odds of Bramel recovering punitive damages were slim. In addition, he was concerned about whether his clients could recover their economic damages due to Stanley's recent summary judgment victory in an Ohio federal court.

[5] Bramel admitted that two or three days elapsed between the time when he called his accountant and January 18, when he first spoke with Kuhling. Consequently, I conclude that he must have been informed of the potential conflict and advised to seek independent counsel before he received the letter dated and mailed January 17. The absolute earliest that Bramel could have received that letter was on January 18—the day that he first spoke with Kuhling about representation and at least two days after he had begun his search for independent legal advice.

original settlement deadline, January 26, 1994, to January 28, 1994, giving Bramel and three other clients additional time to sign their settlement agreements.

Griffin first spoke with Kuhling on January 27, 1994. During that conversation, Kuhling informed Griffin that he believed that a conflict of interest existed and that what "[Brandt and Griffin] were doing was unethical." Kuhling told Griffin that "the only fair thing to do" was to waive his attorney fees and that, if he did so, Bramel would accept the $133,045.31 settlement offer. Griffin refused to waive his entire fee. Griffin also informed Kuhling that, if Bramel was going to accuse him of ethical violations, he would not be able to represent Bramel in his case against Mac Tools. Griffin offered to reduce his fee by $5,000, but, acting on Kuhling's advice, Bramel rejected that offer.

Bramel ultimately signed the settlement agreement with Stanley. On January 31, 1994, Brandt sent Bramel a check for $73,174.92, the net amount of Bramel's settlement after deducting attorney fees. Less than two months later, with Kuhling's assistance, Bramel drafted and sent a complaint to the Bar.

Most of the remaining facts discussed by the majority primarily pertain to the alleged violation of DR 1-103(C) (requiring full and truthful responses to inquiries in disciplinary proceeding). Because I concur in the majority's holding that the Bar did not prove by clear and convincing evidence that the accused violated DR 1-103(C), I shall refrain from repeating the facts that relate to that allegation.

## ALLEGED VIOLATIONS

The majority concludes that the accused violated DR 5-101(A)(1) (prohibiting accepting or continuing employment when exercise of lawyer's judgment will be or reasonably may be affected by lawyer's own interest, except with client consent after full disclosure), DR 1-102(A)(3) (prohibiting engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation), and DR 2-108(B) (prohibiting, in connection with settlement, entering into agreement that restricts lawyer's right to practice law). I begin with the alleged violations of DR 5-101(A)(1) and DR 1-102(A)(3).

The majority concludes that a conflict existed in violation of DR 5-101(A)(1) when the accused agreed to Stanley's retainer proposal on January 11, 1994, reasoning that at that time the accused "acquired an interest that did, or reasonably might have, affected the exercise of their professional judgment on behalf of Bramel." 331 Or at 133. To the extent that the majority suggests that the accused's professional judgment was affected by their own self-interest when the settlement offers were negotiated, I disagree.

The total settlement amount, $13.32 million, and Bramel's individual settlement amount, $133,045.31, were negotiated and agreed to at the global settlement meeting held on December 20, 1993. The record is very clear that retainer was not an issue during the December 20 meeting. The record also indicates that the plaintiffs' counsel believed that the $13.32 million was a favorable settlement for their clients and that Stanley would go no higher with their settlement offer. I emphasize that the final settlement amount offered by Stanley to each of the plaintiffs was negotiated without the retainer issue on the table. Bramel's actual settlement amount serves as an example of the favorableness of the settlement offers negotiated by the accused on behalf of their clients. Bramel conceded when he retained the accused that his actual damages were approximately $142,000. That assessment presumably did not include the $6,300 that Mac Tools claimed that Bramel still owed for his tool inventory and that ultimately was forgiven. The record demonstrates that the ultimate settlement amount offered for Bramel's claim was $133,045.31. That amount approximately is equal to Bramel's actual damages ($142,000) minus the $6,300 he owed ($135,700). Consequently, I cannot agree that the accused were not striving to achieve the best possible settlement for their clients on December 20, or that their judgment somehow was clouded by a retainer offer that, in their minds, no longer existed. That is critical, because the amount agreed to on December 20 *did not change* as a result of the plaintiffs' lawyers' agreement to the retainer arrangement proposed by Stanley on January 11, 1994.

To the extent, however, that the majority asserts that the accused's professional judgment was affected by their own self-interest *after* they agreed to sign the retainer

agreements on January 11, 1994, I agree. The majority and I part company, however, in our analysis of the disclosure given by the accused to Bramel concerning that conflict.

The majority concludes that the accused's disclosure of that conflict under DR 10-101(B)(1) was insufficient.[6] Focusing on the January 17, 1994, letter written by the accused to their clients—the purpose of which was *to confirm oral disclosures that already had occurred*—the majority emphasizes that the letter: (1) by its wording, led the clients to believe that there was no conflict; and (2) was insufficient because it did not inform the clients of the exact terms of the retainer agreements or of the escrow arrangement. 331 Or at 136-37.

The primary flaw in the majority's analysis of the accused's disclosure under DR 10-101(B) is its presumption that the January 17, 1994, letter mirrored the oral disclosure that Griffin had made to Bramel on January 13.[7] Based on the actions taken by Bramel after his conversation with Griffin on January 13, I conclude that Griffin fully had apprised Bramel *orally* about the potential conflict and the adverse impact that that conflict may have had on the settlement agreement negotiated on his behalf. Following that conversation, and before he could have received the January 17 letter, Bramel sought the advice of independent counsel to review the proposed settlement agreement.[8] Bramel also testified that, although he might not have communicated it to Kuhling, he had been informed by Griffin that there was a deadline to agree to the settlement. Bramel's impression that his lawyers had "switched sides" and had "deserted" him also indicate to me that Bramel was aware of the potential

---

[6] DR 10-101(B)(1) defines "[f]ull disclosure" as:

"[A]n explanation sufficient to apprise the recipient of the potential adverse impact on the recipient, of the matter to which the recipient is asked to consent."

[7] DR 10-101(B)(2) states that " 'full disclosure' * * * shall be contemporaneously confirmed in writing."

[8] Bramel began his search for independent counsel two or three days before he actually spoke with Kuhling for the first time on January 18, 1994, that is, after his January 13 telephone conversation with Griffin and *before* he received the January 17 letter. *See* 331 Or at 119 n 5 (so discussing).

adverse impact that Stanley's future retainer of the accused had on his case.[9]

Finally, I also would point out that, even if the January 17, 1994, letter had been the only disclosure made to Bramel—which it was not—I do not believe that DR 10-101(B)(1) required the accused to disclose every provision of the retainer arrangement that had been negotiated on January 11. That rule requires an adequate explanation of the nature of the potential conflict, not disclosure of each and every detail surrounding the potential conflict. The required disclosure occurred here. The letter disclosed that an offer to be retained at the close of the plaintiffs' cases had been made by Stanley and accepted by the plaintiffs' counsel. The letter disclosed that the acceptance of that offer might have created a potential conflict of interest. The letter also advised clients to seek independent legal advice to determine whether consent to the settlement and to the conflict should be given. And the letter was sent contemporaneously with the accused's oral disclosures to their clients. Accordingly, I do not believe that DR 10-101(B)(1) required the accused to say more than was said in the January 17 letter and, therefore, I conclude that the requirements of "full disclosure" under that rule were satisfied.

To that end, I also note that, generally, lawyers are asked to do three things when they have a question regarding the disciplinary rules: (1) disclose to the client; (2) advise the client to seek independent legal advice; and, (3) call the Bar. The issue is not whether the accused did what they were advised to do, but whether what they did was sufficient. Because I believe that it was, I would hold that the Bar has not proved a violation of DR 5-101(A)(1) by clear and convincing evidence. I dissent from the majority's holding that the

---

[9] I agree with the majority's proposition that, under DR 10-101(B), a client's subjective understanding is not dispositive that the "full disclosure" requirements of the rule have been met. I do not agree, however, that a client's subjective understanding is irrelevant to the inquiry. *See* DR 10-101(B)(1) (requiring "explanation sufficient to apprise the recipient of the potential adverse impact on the recipient"); *cf. Macy v. Blatchford,* 330 Or 444, 454, 8 P3d 204 (2000) ("An explanation clarifies an issue or makes it *understandable to the recipient* * * *." (Emphasis added.)).

Bar has done so, and I would dismiss the 5-101(A)(1) charge against each of the accused.

Turning to DR 1-102(A)(3), the majority concludes that the accused made "affirmative misrepresentations" to Bramel and to the Bar. 331 Or at 138-39, 140-41. That conclusion primarily is based on the majority's interpretation of the words "after," "separate," and "finalized" used by the accused in their January 17, 1994, letter to Bramel describing what had transpired at the meeting with Stanley on January 11, and again in their letter dated April 21, 1994, to the Bar, responding to Bramel's complaint. The majority also concludes that the accused violated DR 1-102(A)(3), because they failed to inform Bramel that the retainer and escrow agreements had been signed on January 11 and failed to tell him about the indemnification terms included in the retainer agreement.

Again, my reading of the record indicates that the Bar has failed to demonstrate that its interpretation of the words "after," "separate," and "finalized" is more probable, let alone highly probable, in comparison with the interpretation of those words by the accused. The accused's interpretation of those words especially is reasonable when one considers the sequence of events that took place between December 20, 1993, and January 11, 1994. The record indicates that the retainer arrangement in fact was proposed on January 11, *after* the parties had agreed to the settlement *amount* on December 20. The retainer arrangement also was *separate* from the settlement in that: (1) the offer was distinct from the settlement amount ("sum certain") previously agreed to on December 20; (2) the retainer agreements were separate documents being held in escrow; and (3) the retainer agreements would not take effect unless all the individual clients consented to the retainer and until *after* all the individual settlement agreements were executed. As discussed above, the accused had disclosed to their clients the agreement to be retained by Stanley in the future, *i.e.*, once consent from their clients had been given and the settlement was complete. Finally, the record indicates that all the plaintiffs' counsel *and* Stanley believed that, as of December 20, the settlement "was a done deal." I agree with the dissent written by my colleague Justice Riggs on this point: Under the circumstances,

even though their clients had not yet signed the final settlement agreements, it was reasonable for the accused to believe that the settlement amount had been "finalized" before the retainer arrangement was proposed.

My view of the alleged misrepresentation by omission simply is that no such misrepresentation occurred. For the reasons explained above in my analysis under DR 10-101(B), I do not believe that the accused were required by the disciplinary rules to disclose to Bramel the details surrounding the retainer proposal or the terms of the retainer agreements themselves. Consequently, I conclude that the Bar has not proved clearly and convincingly that the accused engaged in conduct involving misrepresentation, either affirmatively or by omission, and I would dismiss the DR 1-102(A)(3) charges against them.

Finally, I concur in the majority's holding that the accused violated DR 2-108(B), which provides:

> "In connection with the settlement of a controversy or suit, a lawyer shall not enter into an agreement that restricts the lawyer's right to practice law."

The agreement by the accused in this case to be retained in the future by Stanley, in connection with the settlement that they previously had negotiated for their clients, was a violation of DR 2-108(B). Although the signed retainer agreements would not go into effect until after all the plaintiffs had consented to the retainer and signed the settlement agreements, the *effect* of the agreement to be retained by Stanley, made by the plaintiffs' lawyers in connection with the settlement, was the same as an agreement, made in connection with the settlement, never again to sue Stanley in the future. Although I agree with the accused's assertion that all retainer agreements restrict a lawyer's right to practice law in some way or another, not all agreements restricting a lawyer's right to practice law are unethical under DR 2-108(B). Only those made in connection with settlement violate that rule.

DR 2-108(B) is a clear prohibition against restrictive covenants.[10] As noted by the majority, the rationale behind

---

[10] Oregon Formal Ethics Opinion No 1991-47, approved by the Board of Governors, July 1991, provides that it would be unethical under DR 2-108(B) either to

DR 2-108(B) and Model Rule 5.6 (derived from DR 2-108(B)) is threefold: (1) such agreements restrict the public's ability to retain counsel of choice; (2) within the context of such an agreement, the client's actual recovery might have more to do with the desire to restrict an opponent's practice than the merits of the client's claim; and, (3) such agreements create potential conflicts of interest. ABA Formal Opinion 371 (April 16, 1993). Those public policy concerns were not eliminated by the escrow arrangement entered into by the plaintiffs' counsel on January 11, 1994. Consequently, I find by clear and convincing evidence that the accused entered into an agreement in connection with settlement that restricted their practice of law. In so finding, I concur in the majority's holding that the accused violated DR 2-108(B).

In summary, because I would find that the Bar did not prove by clear and convincing evidence that the accused violated DR 5-101(A)(1), DR 1-102(A)(3), or DR 1-103(C), I would dismiss those charges against the accused. I concur, however, in the majority's holding that the Bar proved that the accused violated DR 2-108(B).

## SANCTION

Having determined that the conduct of the accused violated DR 2-108(B), I turn to the question of the appropriate sanction for that violation. In doing so, I bear in mind that the purpose of lawyer discipline proceedings, as provided by the American Bar Association's *Standards for Imposing Lawyer Sanctions* (1991) (amended 1992) (ABA Standards), is to

> "protect the public and the administration of justice from lawyers who have not discharged, will not discharge, or are unlikely to properly discharge their professional duties to clients, the public, the legal system, and the legal profession."

ABA Standard 1.1. This court similarly has noted:

---

propose or to accept a settlement agreement that includes a provision in which a lawyer agrees that he never again will represent a client who has a claim against the defendant in the matter being settled.

"The objects of [lawyer discipline] proceedings are to uphold the dignity and respect of the profession, protect the courts, preserve the administration of justice and protect clients."

*In re Carstens*, 297 Or 155, 166, 683 P2d 992 (1984).

Following the analytical framework for determining the appropriate sanction in lawyer disciplinary cases set forth in the ABA Standards, I first consider the following three factors: (1) the duty violated; (2) the accused's mental state; and (3) the actual or potential injury caused by the accused's misconduct. ABA Standards at 6; ABA Standard 3.0.

In this case, the only duty violated by the accused when they agreed to be retained by Stanley was their duty owed as professionals. ABA Standard 7.0. DR 2-108(B) is included among those rules that provide "ethical standards that are not fundamental to the professional relationship but which define certain standards of conduct." *Id.* ABA Standard 7.0 provides, in part:

"* * * While [standards that are not fundamental to the professional relationship but which define certain standards of conduct] have been developed out of a desire to protect the public * * * a violation of these standards generally is less likely to cause injury to a client, the public, or the administration of justice * * *.

"In general, then, a sanction of disbarment or suspension will rarely be required, and a sanction of reprimand, admonition or probation will be sufficient to ensure that the public is protected and the bar is educated. * * *"

Turning to the accused's mental state, I cannot agree with the majority's conclusion that the accused acted intentionally when they violated DR 2-108(B). As mentioned above, this is the first disciplinary case in Oregon in which this court has had the opportunity to apply DR 2-108(B) in this context. After consulting with the Bar's general counsel, the accused disclosed the retainer agreement to their clients and advised their clients to seek independent counsel. Based on the foregoing, and the totality of the circumstances surrounding the settlement negotiations with Stanley, I find that, at most, the accused acted negligently when they entered into the retainer agreement with Stanley, that is,

they "fail[ed] to be aware of a substantial risk that circumstances exist or that a result will follow[.]" ABA Standards at 6.

Moving on to the injury caused by the accused's conduct, I agree with the majority that the Bar has failed to demonstrate that the accused's violation of DR 2-108(B) caused actual harm to Bramel, the public, or the legal system. There is nothing in the record that demonstrates that Bramel would have received a larger settlement if the accused had not agreed to be retained by Stanley. Unlike the majority, however, I also find that the conduct of the accused in this case caused little, if any, potential harm to Bramel, the public, or the legal system. I agree that, in some instances, an agreement to be retained in the future by an opponent could create the possibility that settlement of the current case does not reflect the value of the claims at issue in that case, because the professional judgment of the lawyer violating DR 2-108(B) might have been affected. In this proceeding, however, the settlement amounts negotiated by the accused for their clients were agreed to on December 20, 1993, at a time when, as far as the accused were concerned, being retained by Stanley was not an issue. Consequently, the accused's professional judgment could not have been affected on December 20, 1993, by the retainer arrangement proposed subsequently on January 11, 1994. Nor were their loyalties divided at the time when the settlement amount was negotiated. Furthermore, nothing in the record indicates that the settlement between Stanley and the accused's clients did not reflect the value of the clients' claims. In fact, the record demonstrates that the settlement amounts that the accused negotiated on behalf of their clients reflected approximately 80 percent of their clients' latest demands.

Examining the duty violated, the accused's mental state, and the lack of potential or actual injury caused by the violation of DR 2-108(B) in this proceeding, the accused's violation implicates ABA Standard 7.3, which provides:

> "Reprimand is generally appropriate when a lawyer negligently engages in conduct that is a violation of a duty owed as a professional, and causes injury or potential injury to a client, the public, or the legal system."

Having found that the accused's misconduct was negligent and caused no actual injury and little, if any, potential injury to Bramel, the public, or the legal system, I make an initial determination that a reprimand is the appropriate sanction in this case.[11]

With that in mind, I next consider the applicable aggravating and mitigating factors. *See* ABA Standards at 6 (after making initial determination about appropriate sanction, court then considers relevant aggravating and mitigating factors). The only aggravating factor present in this case is that both the accused have substantial experience in the practice of law.[12] ABA Standard 9.22(i). On the other hand, in mitigation, the accused provided full and free disclosure during the disciplinary investigation and had cooperative attitudes toward the proceedings. ABA Standard 9.32(e). Additionally, neither of the accused have a prior disciplinary record. ABA Standard 9.32(a); *see also In re Cohen*, 330 Or 489, 500, 8 P3d 953, 959 (2000) (inaccurate to characterize

---

[11] ABA Standard 7.4 suggests that an admonition generally is appropriate when a lawyer

> "engages in an isolated instance of negligence that is a violation of a duty owed as a professional, and causes little or no actual or potential injury to a client, the public, or the legal system."

The accused's violation of DR 2-108(B) in this case was an isolated instance of negligence that caused little or no actual or potential injury to Bramel, the public, or the legal system. An admonition, however, is not an available sanction in a "disciplinary proceeding" such as this, in which the Bar charges a lawyer with misconduct "in a formal complaint." *See* BR 1.1(m) ("disciplinary [p]roceeding" defined as proceeding in which Bar charges lawyer with misconduct "in a formal complaint"); BR 6.1 (listing "sanctions" available in "disciplinary proceedings" as public reprimand, suspension, disbarment, restitution, and reimbursement to Client Security Fund); BR 5.5(a) (defining "[p]rior record," for purpose of prohibiting admission of same to prove character or to impeach as "any contested * * * disciplinary * * * decision of the Disciplinary Board or the Supreme Court which has become final").

[12] Brandt has received a letter of admonition, dated August 3, 1993. In 1990, apparently in a hurry to meet a filing deadline, Brandt filed a third-party complaint against one of his law firm's current clients without running a "conflict-check." The first allegation in the admonition arose from that conduct, the second from Brandt allowing his staff to help prepare and file that third-party complaint.

Because the conduct that resulted in that admonition (current-client conflict) is not similar in nature to the misconduct that occurred in this case (restriction of the practice of law in connection with settlement), I do not consider that letter in aggravation. *See In re Cohen*, 330 Or 489, 500, 8 P3d 953, 959 (2000) (letter of admonition considered as evidence of earlier instance of misconduct only if earlier misconduct giving rise to letter of admonition was same or similar in nature to later misconduct).

letter of admonition as form of "sanction" or "prior record" of discipline imposed on accused lawyer).

Finally, I turn to this court's case law. When addressing a violation of a disciplinary rule for the first time, this court previously has held that a public reprimand is the appropriate sanction. *In re Banks*, 283 Or 459, 482, 584 P2d 284 (1978). Similarly, I conclude that a reprimand is sufficient to "ensure that the public is protected and the bar is educated" regarding violations of DR 2-108(B) under the circumstances presented by this case. ABA Standard 7.0.

Accordingly, following my examination of the applicable ABA Standards, keeping in mind that violation of DR 2-108(B) is the sole issue in this case, and taking into consideration the fact that this is the first time that this issue has been litigated in a disciplinary case in Oregon, I would conclude that a reprimand is the appropriate sanction for both the accused.

Riggs, J., joins in this opinion in part, as set forth in his separate opinion.

**RIGGS, J.,** concurring in part and dissenting in part.

I concur with the majority's findings that the accused did not violate Disciplinary Rule (DR) 1-103(C).[1] I respectfully dissent from the majority's findings that the accused violated DR 2-108(B), DR 5-101(A)(1), and DR 1-102(A)(3), and I would dismiss entirely those allegations. I join the separate concurring and dissenting opinion of my colleague, Justice Kulongoski, except to the extent that he finds that the accused violated DR 2-108(B). As to DR 5-101(A)(1) and DR 1-102(A)(3), I do not believe that the nature of the accused's representations to Bramel or the Bar suggests the mental state that the majority opinion imputes. Moreover, even if the majority is correct in its findings of fact and the inferences that flow from them, I believe that the sanctions imposed are excessive.

---

[1] This is a consolidated law, er disciplinary proceeding, and I follow the majority's characterization of Brandt and Griffin collectively as "the accused."

It is impossible to overemphasize our role here. We are reviewing, *de novo*, whether the Bar has sustained its burden of proving each allegation by clear and convincing evidence. I note at the outset that I agree with the majority as to the *meaning* of most, but not all, of the relevant disciplinary rules. Whether the accused's conduct in this proceeding violated those rules, however, is a very different matter.

My review of the record indicates that this is a much closer case than the majority opinion acknowledges. Although this proceeding does not have many disputed *facts*, the parties hotly dispute the *inferences* that can be drawn from those facts. It is those inferences that are crucial to deciding this proceeding. As Justice Kulongoski's opinion aptly demonstrates, many, if not most, of the facts and inferences can be viewed from a perspective that supports the accused's theories. Because that is so, and for the reasons explained below, I believe that the Bar has failed to meet its burden of proving the charges by clear and convincing evidence.

Turning first to the majority's analysis of the DR 5-101(A) matters, the issue is whether, given what Bramel knew at the relevant times, the accused told Bramel *enough* so that he was aware of a potential adverse impact on him if he consented to the accused's prospective employment relationship with Stanley. It is true that DR 10-101(B) (quoted in the majority opinion) speaks of "full disclosure." This court recently considered the meaning of the term "full disclosure" in *In re Hassenstab*, 325 Or 166, 175, 934 P2d 1110 (1997). There, this court held that full disclosure of a conflict meant "an explanation sufficient to apprise the client of the potential adverse impact upon that client." *Id.* Here, the majority, at the Bar's urging, expands that definition to require disclosure of virtually all details of a potential adverse impact—a much higher standard than the rule and our case law require. As I explain below, I do not believe that DR 5-101(A) required the accused to say more to Bramel than what was said in the January 17, 1994, letter.

First, I disagree with the majority's analysis of the statements that the accused made in their January 17, 1994,

letter to Bramel. In my view, the majority's temporal analysis—which permeates its opinion, especially its analysis of DR 1-102(A)(3)—is only one of two reasonable ways to view the facts. For example, the majority takes the accused to task for their use of the wording "after" in their January 17, 1994, letter to Bramel ("[a]fter we obtained Mac/Stanley's agreement to resolve our cases for a sum certain").[2] Looking at the chain of events, it is possible to view that statement as the accused's reasonable interpretation of the facts: the retainer agreement was suggested by Richards on January 6, 1994, which was "after" December 20, 1993, the day that the plaintiff's lawyers and the lawyers for Stanley agreed on a settlement amount. On January 4, 1994, Richards sent by facsimile the three versions of settlement forms to Brandt. On January 6, Wagner wrote a letter to Richards that stated that those settlement forms were acceptable to the plaintiffs' lawyers. At that point, "after" the lawyers had agreed not only on a settlement amount, but also on the written form of the settlement agreements, Richards suggested the retainer agreement. It is true that, on January 6, 1994, all the clients had not yet signed the settlement agreement and, therefore, the cases technically were not "finally" settled. On that date, however, a reasonable lawyer, familiar with representing individuals in a litigation or negotiation context, as the accused were, could have considered the case as a "done deal." After all, the plaintiffs' lawyers had agreed on a settlement amount and the terms of payment, which are usually the most important components of a settlement agreement. In the circumstances of that litigation, in which the accused were familiar with their clients' expectations for settlement, it is not unreasonable for the accused to have believed that their clients would consent to the settlement.

In their January 17, 1994, letter to Bramel, the accused stated that Stanley had made a "separate offer to hire" the accused. In fact, the retainer agreement was a physically "separate" agreement and purposefully was structured in a separate way in the escrow arrangement suggested by

---

[2] Similarly, in its analysis regarding DR 1-102(A)(3), the majority faults the accused for a similar reference in the accused's April 21, 1994, letter to the Bar ("[a]fter the settlement was finalized").

the mediator.[3] Finally, in their April 21, 1994, letter to the Bar, the accused's statement that they did not agree "to work for Mac Tools[/Stanley] while the case was still pending" also can be interpreted reasonably not to state an intentional misrepresentation. Specifically, that statement could be understood to mean that Stanley would not retain the accused until *after* all the accused's clients' claims were settled. In sum, and with due respect to the majority, the majority's temporal focus does not resolve clearly and convincingly the DR 5-101(A) allegations in the Bar's favor.

The majority also faults the accused for failing to point out certain details surrounding the accused's retainer agreement with Stanley. In the majority's view, the accused should have disclosed in their January 17, 1994, letter to Bramel that they had agreed to place the retainer agreement in escrow pending completion of the settlement. The majority also faults the accused for failing to disclose in that letter that the retainer agreement contained indemnity provisions from Stanley that would be implicated in the event that Bramel sought recovery from the accused. The majority fails to explain why Bramel's interests *legally* were compromised by the indemnity provisions—a seemingly necessary element in the analysis. In fact, an indemnity provision has the effect of providing an additional "pocket" for any potential future recovery by Bramel. Such a provision neither insulated the accused from legal action by Bramel, nor required Bramel to sue additional parties if he seeks recovery from the accused. Neither did the indemnity agreement create or remove any causes of action or defenses on either side. It did not create or restrict jurisdiction or venue, or erect other pleading barriers that otherwise would not have existed. In short, the Bar does not identify—and the majority opinion cannot point to—any legally cognizable or strategic detriment to Bramel that resulted from the indemnity provision. There simply is no obligation to disclose that which is not material to the client's interests and which does no harm to the lawyer-client relationship.

---

[3] It is worth noting that it was the mediator, not the accused, who initiated the idea of the ͞͞crow agreement as a vehicle for solving the accused's concerns about treating the retainer agreement contemporaneously with the settlement.

Finally, the majority reasons that its reading of DR 10-101(B) requires that a detailed explanation of a conflict be made by the lawyer (the accused) directly to the client (Bramel). The majority opinion suggests that it is not enough that a client already knows of the conflict because of the client's discussions with another lawyer or an informed third party, or because the client knows and understands the complete parameters of the conflict as a result of the client's own personal or professional knowledge. No case from this court supports such a reading of the rule. To the contrary, in *In re Bishop*, 297 Or 479, 686 P2d 350 (1984), the court stated:

> "The duty of full disclosure is not satisfied by just advising the client to obtain independent legal advice. *If the client does not obtain such advice*, the lawyer must inform the client that their interests in the transaction are adverse."

*Id.* at 488-89 (construing *former* DR 5-104(A) (1994)) (emphasis added).[4] It makes sense that the converse also must be true: when the client, at the lawyer's recommendation, *does* obtain independent legal advice about the very matter at issue, the amount of disclosure that will be "sufficient to apprise the client" is less, or perhaps becomes nonexistent, because the client now has new representation and might be in an adversarial relationship with the referring lawyer.

Here, the accused timely advised Bramel to obtain counsel, and Bramel did so. Bramel obtained a lawyer who professed particular and substantial knowledge of ethical matters and who undertook active and vigorous representation of Bramel against the accused regarding the very matters that are in dispute under DR 5-101(A) and DR 10-101(B). The accused's disclosure of the nature of the conflict and their recommendation of independent counsel adequately protected Bramel's interests. To say that even more disclosure was required by the accused under those circumstances

---

[4] *Former* DR 5-104(A) (1994) provided that a lawyer must not enter into a business transaction with a client if their interests differ unless the client consents after full disclosure. Although *former* DR 5-104(A) (1994) is not a predecessor to any of the rules at issue in the present case, the current disciplinary rules do not embody a substantially different standard of "full disclosure" than did the former rules. Thus, this court's construction of the concept of "full disclosure" in *former* DR 5-104(A) (1994) informs the analysis of "full disclosure" under current DR 5-101(A) and DR 10-101(B).

ignores what happened here. The majority fails to identify any interest of Bramel that was affected, let alone prejudiced, by the accused's actions.

In sum, the Bar has not proven by clear and convincing evidence that the accused's January 17, 1994, letter failed to tell Bramel *enough* to apprise him of any potential adverse impact on him, given the totality of the somewhat unique facts in this proceeding.

For many of the same reasons discussed above, and particularly because of my temporal analysis, I also dissent from the majority's conclusion that the accused violated DR 2-108(B).

I turn to the majority's discussion of DR 1-102(A)(3). The allegations regarding that charge implicate many of the same facts and inferences discussed above. The Bar's complaint alleges misrepresentation on the part of the accused by commission and omission in what the accused told both Bramel and the Bar. I have discussed above my disagreement with the majority's conclusion respecting the facts surrounding the accused's representations to Bramel, and that analysis extends to DR 1-102(A)(3). The discussion regarding the majority's temporal analysis, *ante*, is appropriate equally to the majority's analysis of misrepresentation to the Bar, and I shall not repeat it here.

Finally, I turn to the sanctions imposed. Because, for the reasons discussed above, the Bar has not met its burden in the "guilt" phase of the proceeding, a sanction is not warranted. Even if, as the majority believes, the Bar has met its burden of proving violations of several disciplinary rules, the sanctions imposed by the majority are inappropriate in light of the accused's mental state.

I disagree with the majority's view that the accused acted with intent when they represented certain facts to Bramel and the Bar. To me, the record does not demonstrate clearly and convincingly that the accused acted with a "conscious objective or purpose to accomplish a particular result." American Bar Association's *Standards for Imposing Lawyer Sanctions* (1991) (amended 1992) (ABA Standards) at 7. Rather, I conclude that the accused acted with "knowledge,"

that is, "the conscious awareness of the nature or attendant circumstances of the conduct but without the conscious objective or purpose to accomplish a particular result." *Id.* As they stated in their January 17, 1994, letter to Bramel, the accused were aware that the retainer agreement might have created a conflict of interest. Despite that awareness, I do not believe that the accused's failure to disclose the details of the escrow arrangement or the existence of the indemnity agreement was because of any "conscious objective or purpose."

As the majority notes, a lawyer's failure to disclose fully a known possible conflict implicates ABA Standard 4.32, which provides for suspension as a possible sanction where the lawyer's failure to disclose "causes injury or potential injury to a client." The majority does not point to, nor does this record reveal, any *actual* financial injury to Bramel. The record does not indicate, and no one suggests, that the settlement amount to which Bramel last agreed was inadequate compensation for the loss that Bramel suffered at the hands of Stanley. Thus, the Bar is left with only "potential" injury to Bramel. With ABA Standard 4.32 in mind, I conclude that the potential client injury shown here is not sufficient to justify the length of the suspensions imposed by the majority.

Turning to aggravating and mitigating circumstances, my analysis again parts company with the majority's. I do not find that the accused engaged in a "pattern of misconduct" in their dealings with either Bramel or the Bar. ABA Standard 9.22(c). Rather, the conduct here constitutes a single transaction: it involves neither a series of unrelated acts nor multiple victims. The accused took a position that they believed was correct in a novel and highly complex piece of litigation. They made representations to Bramel and to the Bar that were interrelated and were consistent with their initial position. On this record, there simply is no *pattern* of misconduct. *Cf. In re Schaffner*, 323 Or 472, 480, 918 P2d 803 (1996) (finding pattern of misconduct where accused repeatedly failed to respond or to take action to protect clients' interests and failed to answer Bar's continuing inquiries over considerable period of time). Therefore, the Bar has not established that aggravating factor.

I also disagree with the majority's conclusion that the accused acted with a dishonest or selfish motive when they communicated with the Bar.[5] ABA Standard 9.22(b). For the reasons already discussed, I do not believe that the accused communicated dishonestly with the Bar.

Finally, in mitigation, I emphasize the accused's lack of a disciplinary record. ABA Standard 9.32(a). Griffin has no prior disciplinary record, and Brandt's 1993 letter of admonition is of no moment here. *See In re Cohen*, 330 Or 489, 500, 8 P3d 953, 959 (2000) (holding that letter of admonition is evidence of earlier misconduct only if misconduct that gave rise to letter was similar to misconduct at issue). Accordingly, each of the accused has approximately 25 years of unblemished membership in the Bar.[6] *See* ABA Standard 9.3(g) (listing "character or reputation" as mitigating circumstance). In sum, the sanction selected by the majority is unjustified.

For the foregoing reasons, I concur in part and dissent in part from the majority opinion. I also join in part the separate concurring and dissenting opinion of Justice Kulongoski, as set out in this opinion.

Kulongoski, J., joins in part in this opinion as set out in his separate concurring and dissenting opinion.

---

[5] In my view, Bramel, however wronged, reasonably can be seen as the kind of occasional and difficult client familiar to most members of the litigation bar: A person with unreasonable expectations that often are impossible to meet. Although I believe that the contingent fee that the accused would receive upon settlement of Bramel's claim *could* have motivated the accused to act the way they did, I also believe that the accused might have been motivated equally by the understandable desire to get Bramel out of their collective "hair" as quickly as possible. My guess is that the accused gladly would have settled for almost anything that resulted in Bramel just "going away." Based on my own occasional experience with similarly minded clients, that is an understandable sentiment, even though it never justifies unethical conduct by a lawyer.

I emphasize that I recognize that Bramel's desirability as a client makes no difference with respect to whether the accused violated these disciplinary rules. In analyzing the appropriate sanction, however, I do believe that Bramel's attributes as a client bear on the evaluation of the accused's motives and state of mind.

[6] Unfortunately, the record does not disclose whether, and to what extent, either of the accused were active in Bar service activities, *pro bono* work, or community activities.